IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LEAGUE OF WOMEN VOTERS OF          )
WISCONSIN, PATRICIA ANN            )
VILLARREAL, SASHA ALBRECHT,        )
                                   )
        Plaintiffs,                )
                                   )        No. 19-cv-1029
    v.                             )
                                   )
DEAN KNUDSON, JULIE M. GLANCEY,    )
ROBERT F. SPINDELL, JR., MARK L.   )
THOMSEN, ANN S. JACOBS, MARGE      )
BOSTELMANN, in their official capacity  )
as members of the Wisconsin Elections  )
Commission, MEAGAN WOLFE, in her   )
official capacity as the Administrator of the  )
Wisconsin Elections Commission,    )
                                   )
        Defendants.                )
_____)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs League of Women Voters of Wisconsin, Patricia Ann Villarreal, and Sasha Albrecht (collectively, "Plaintiffs") seek declaratory and injunctive relief as follows:

**NATURE OF ACTION**

1.      In 2015, the Wisconsin Legislature enacted a law requiring the Wisconsin Elections Commission ("WEC" or "the Commission") to join the Electronic Registration Information Center ("ERIC"), a non-profit organization run by and for twenty-eight states and the District of Columbia, which works to improve the accuracy of state voter rolls and to identify individuals who are eligible to vote but are not registered.  ERIC ingests voter registration files and government transaction data that the member states provide, namely from Departments of Motor Vehicles ("DMVs"), and uses its matching methodology to identify registered voters on the rolls who appear to have moved within or to a different state, or who appear to have died while out of

state, as well as individuals who appear to be eligible but unregistered to vote. ERIC then aggregates this information about apparent movers and compiles it into an electronic record that it provides to the Commission (the "list" or "ERIC list"). ERIC provided its first "movers" list to Wisconsin in late 2017, and its second earlier this year.  The Commission mailed out letters to all registered voters on the 2019 ERIC list.

2.      The Commission uses the ERIC list, in part, to identify those registered Wisconsin voters who appear to have changed their residential address from the address at which they are registered to vote, and to mail a letter to those voters suggesting they either confirm that their address is current, or if they have moved within the State of Wisconsin, to register to vote at their new address.   In October 2019, the Commission mailed out letters to all 234,039 registered Wisconsin voters on the 2019 ERIC list (the "2019 ERIC letter").

3.      Wisconsin is one of only six states that is exempt from the entirety of the National Voter Registration Act (the "Motor Voter Law"), 52 U.S.C. §§ 20501 *et seq*.  *See* 52 U.S.C. § 20503(b)(2).  Of the 28 states and D.C. participating in ERIC, only Wisconsin and Minnesota need not comply with the federal requirement to provide notice and wait for two general elections with a federal office to pass before removing from the rolls a registered voter who appears to have moved according to the U.S. Postal Service's National Change of Address ("NCOA") information. 52 U.S.C. §§ 20507(b)(2), 20507(d)(1)(B).

4.      But Wisconsin's voter list maintenance laws differ from Minnesota's laws as well, leaving Wisconsin on its own, facing a singularly unique problem that has not plagued any other state participating in the ERIC network.  In Wisconsin, a registered voter must be removed from the poll books within 30 days of the date on which the Commission mails the letter if there is "reliable information" that they have moved outside the municipality, Wis. Stat. § 6.50(3), whereas

Minnesota only requires a registered voter's removal from the rolls if there is evidence the voter has moved to another state.  Minn. Stat. § 201.12(3).  Minnesota automatically updates its voter rolls for a change of address *within the state*, Minn. Stat. § 201.12(2.), while Wisconsin only automatically updates a voter's registration record for a change of address *within the same municipality*.  Wis. Stat. § 6.50(3).

5.      If there is "reliable information" that a registered voter has moved from one municipality to any of the other 1,849 municipalities in Wisconsin, that voter will be queued up for removal within 30 days of the mailing of the notice under Wis. Stat. § 6.50(3).  In the 2017-2018 ERIC voter list maintenance period, the Commission found that the overwhelming majority—82.6 percent—of the "movers" on the ERIC list were in-state movers.  Ex. A, Wisconsin Elections Commission Memorandum, *Assessment of Wisconsin's Electronic Registration Information Center (ERIC) Participation*, at 3 (Mar. 11, 2019).  The memorandum did not further disaggregate those statistics by inter- or intra-municipality movers.

6.      Wisconsin is, therefore, the only ERIC member state that—within 30 days of a notice's mailing—will remove a registered voter who has merely moved to a different municipality within the state.  The combination of these features of Wisconsin election law make it extremely important that, as the U.S. Constitution requires, the Commission's voter roll maintenance rules and procedures afford registered Wisconsin voters adequate and clear notice of officials' intention to remove voters from the rolls, the steps voters need to take to remain registered to vote, the consequences of failing to take action, and the deadline for any such action.  It is also extremely important that, again as required by law, these voting rules and procedures not be communicated to voters and then suddenly changed close to elections, inducing voters' detrimental reliance.

7.     In *Zignego v. Wisconsin Elections Commission*, a state court in Wisconsin has ordered the Commission to *immediately* remove 234,039 registered Wisconsin voters, or seven percent of the state's 3,304,914 registered voters, from the voter registration rolls within 30 days of the Commission's mailing of the letter, in keeping with its interpretation of Wis. Stat. § 6.50(3).[1] The Commission's policy of waiting 12 to 24 months before deactivating a voter has been invalidated. *See* Ex. B, Wisconsin Elections Commission Memorandum, *Wisconsin's Electronic Registration Information Center (ERIC) Movers Analysis*, at 3-5 (Jun. 11, 2019). The Court ruled from the bench, granting a writ of mandamus and denying a stay of its order, and issued the writ of mandamus on December 17, 2019. *See* Ex. F.

8.     These 234,039 voters, whom the Commission suspected of having moved to a new residential address based on a flawed data set provided by ERIC, were not given notice that they were facing removal from the rolls; nor were they provided notice of the timeline within which to take action to remain registered to vote in Wisconsin. Accordingly, these voters were deprived of their right to procedural due process, which at a bare minimum requires adequate notice and an adequate opportunity to be heard *prior to* the deprivation of a right or statutory entitlement, which embraces voter registration. Defendants' Counsel at the Wisconsin Department of Justice have already conceded this due process violation at the same hearing at which the Circuit Court ruled from the bench: "[The ERIC letter] does not provide any notice of deactivation, in thirty days or otherwise . . . this would change the status quo, deactivate registered electors without any notice." Ex. C, Transcript of December 13, 2019 Hearing on Motion for Temporary Injunction or, in the

---

[1]   Wisconsin Elections Commission, VOTER REGISTRATION STATISTICS (Dec. 2019), https://elections.wi.gov/node/6638.

Alternative, a Writ of Mandamus, *Zignego v. Wisconsin Elections Commission*, Case No. 2019CV000449 (Ozaukee County Circuit Court, Branch 1) ("Hr'g Tr."), at 58:23-59:2.

9.     While the issuance of this writ of mandamus and the denial of the stay request create the exigency that requires preliminary injunctive relief in this case, Plaintiffs' constitutional claims are valid and will be pressed, even if the Supreme Court of Wisconsin were to reverse the Circuit Court, reinstating the Commission's policy of waiting 12 to 24 months before deactivating 2019 ERIC list voters.

10.     A subset of these 234,039 registered Wisconsin voters have not in fact moved from the residential address listed on the 2019 ERIC letter mailed to them.  The Commission's letter led these voters to believe that they would still be registered to vote and that they could confirm their existing registration address by, among other things, simply voting in "the next election."  The letter did not specify whether this was the next election that occurred or the next election in which the voter cast a ballot.  Absent a specific date, a reasonable voter would have understood "the next election" to mean the next election in which they voted.  These voters have been deprived of their right to due process because many will detrimentally rely on the Commission's representation that they can confirm their registration address by voting in "the next election."  Many voters in this subset will show up at the polls without documentary proof of residence required to register to vote, on the government-induced belief that they need not re-register in order to vote at their usual polling place.

11.     Finally, these state court-ordered changes in the Commission's rules and procedures come on the eve of a state spring primary election and a special primary election for the U.S. Congressional District 7 seat, both to be held on February 18, 2020.  Absentee ballots

must be mailed out by municipal clerks 21 days before the state spring primary election, and on

January 2, 2020 for the Congressional District special primary.  Ex. C, Hr'g Tr. at 77:7-12.

12.     Defendants' Counsel at the Wisconsin Department of Justice have already argued

to the state court that granting the writ of mandamus and effecting this unprecedented, eleventh-

hour change in election rules and procedures would cause irreparable harm to the integrity and

efficiency of these elections' administration: "If the Commission's duty is for a efficiency of

election administration, . . . this would create chaos, to do this now."  *Id.*  at 77:13-15.[2]

13.     Plaintiffs respectfully request that these due process violations be remedied by the

entry of a temporary restraining order and/or preliminary injunction, which requires Defendants to

immediately mail out new notice letters that adequately and clearly inform registered Wisconsin

voters on the 2019 ERIC list of the Commission's intent to remove them from the voter rolls, the

reason for that voter list maintenance action, the steps they need to take to avoid that outcome,

including clearly explaining the confirmation and voter registration update processes, the

consequences of failing to take action, and the timeline for deactivation if they fail to take action.

The deadline for response will be set by state law, and this is the subject of ongoing state litigation.

14.     Further, Plaintiffs also respectfully request that any purge ordered by Wisconsin

state courts—in keeping with their interpretation of Wisconsin state law—be conducted

immediately *after* the April 7, 2020 presidential primary election.  The next election after that will

be the partisan primary election on August 11, 2020.  That leaves ample time to conduct proper

voter list maintenance that satisfies constitutional scrutiny without sowing chaos by changing, on

---

[2] The U.S. Supreme Court has ruled on multiple occasions, including in the Wisconsin voter ID litigation, that a change in election laws may not be made so close to an election, such that it will create administrative chaos, compromise the integrity of the election, and/or burden the right to vote. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006); *Frank v. Walker*, 135 S. Ct. 1551 (2015) (mem.).

the eve of multiple elections in February, voting and voter list maintenance rules, upon which voters and election administrators rely.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the United States Constitution and seeks equitable and other relief for the deprivation of constitutional rights under color of state law.

16.     This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

17.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18.     This Court has personal jurisdiction over Defendant-Commissioners Dean Knudson, Julie M. Glancey, Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, and Robert F. Spindell, Jr., the members of the Commission, and Meagan Wolfe, the Administrator of the Commission, who are sued in their official capacities.  Defendants Knudson, Glancey, Thomsen, Jacobs, Bostelmann, Spindell, Jr. and Wolfe are state officials who reside in Wisconsin and work in Madison, Wisconsin.

19.     Venue is appropriate in the Western District of Wisconsin, under 28 U.S.C. § 1391(b)(1), because Defendants are state officials working in Madison, Wisconsin.  A substantial part of the events giving rise to these claims occurred and continues to occur in this district, making venue also proper under 28 U.S.C. § 1391(b)(2).

## PARTIES

20.     Plaintiff League of Women Voters of Wisconsin ("LWVWI" or "the League") is a nonpartisan, nonprofit, non-stock corporation organized under the laws of the State of Wisconsin with its principal office located at 612 West Main St., Suite 200, in the City of Madison, Dane County, Wisconsin.  LWVWI is an affiliate of The League of Women Voters of the United States, which has 750 state and local Leagues in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, and Hong Kong.  LWVWI works to expand informed, active participation in state and local government, giving a voice to all Wisconsinites.

21.     LWVWI, a nonpartisan community-based organization, was formed in 1920, immediately after the enactment of the Nineteenth Amendment granting women's suffrage.  The LWVWI is dedicated to encouraging its members and the people of Wisconsin to exercise their right to vote as protected by the Constitution and the Voting Rights Act of 1965. The mission of LWVWI is to promote political responsibility through informed and active participation in government and to act on selected governmental issues. The League seeks to maximize eligible voter participation through its voter registration efforts and encourage civic engagement through registration and voting.

22.     The LWVWI impacts public policies, promotes citizen education, and makes democracy work by, among other things, removing unnecessary barriers to full participation in the electoral process. Currently LWVWI has 20 local Leagues and approximately 2,200 members, including Plaintiff Patricia Ann Villarreal. LWVWI works with and through 20 local Leagues in the following cities, counties, and areas throughout Wisconsin: Appleton, Ashland/Bayfield Counties, Beloit, Dane County, Door County, the Greater Chippewa Valley, Greater Green Bay, Janesville, the La Crosse area, Manitowoc County, Milwaukee County, the Northwoods, Ozaukee

County, the Ripon area, Sheboygan County, the Stevens Point area, the Upper St. Croix Valley, the Whitewater area, Winnebago County, and the Wisconsin Rapids area.

23.     LWVWI began as an organization focused on the needs of women and training women voters. It has evolved into an organization concerned with educating, advocating for, and empowering all Wisconsinites. With members in nearly every county in the State, the LWVWI's local Leagues are engaged in numerous activities, including hosting public forums and open discussions on issues of importance to the community. Individual League members invest substantial time and effort in voter training and civic engagement activities, including voter registration and get-out-the-vote ("GOTV") efforts.  LWVWI has developed the statewide Election Observation Program and the Vote411 voter guide for Wisconsin.

24.     LWVWI also devotes substantial time and effort to ensuring that government at every level works as effectively and fairly as possible. This work involves continual attention to and advocacy concerning issues of transparency, a strong and diverse judiciary, fair and equal nonpartisan redistricting, and appropriate government oversight.

25.     In 2017, 2018, and 2019, to fulfill its mission to foster civic engagement and encourage voter participation, LWVWI made substantial investments in voter registration activities statewide.  In each of these years, LWVWI has incurred expenses to finance voter registration activities, and it has already incurred expenses for the 2020 election cycle.  Since the Wisconsin Legislature eliminated special registration deputies, a designation that previously allowed LWVWI volunteers to review and verify proof of residence documents for voter registration, the LWVWI's work has expanded from actually registering voters to now also assisting voters with their registration.  This legal change forced LWVWI to rethink and change its approach to and practice of registering voters.

9

26. In 2017, LWVWI spent an estimated total of $9,739 on voter registration-related activities, comprising voter registration training ($1,960), creating voter information cards ($279), creating a MyVote training presentation ($1500), and adding and training additional staff ($6,000).

27. In 2018, a year with midterm elections and statewide races like the Governor and Attorney General elections, LWVWI spent approximately $11,295 on voter registration activities, including voter registration training for Access to Independence ($49), voter registration mobile app training ($980), voter registration social media-related activities ($784), voter registration information upgrade to the LWVWI.org website ($196), travel for voter registration activities ($273), voter registration-related postage ($23), GOTV website ($85), local League voter registration support ($980), print materials for local Leagues ($2,951), voter registration-related travel ($190), National Voter Registration Day ($784), and additional staff ($4,000).

28. In 2018, the last general election year, LWVWI collectively hosted a total of 1,057 election-related events, including voter registration drives and candidate events. LWVWI estimated that it collectively registered or updated the registration for 12,582 voters total. Eighteen of LWVWI's 20 local Leagues noted they conduct voter registration and education at area community colleges, technical schools, and/or universities. All 20 local Leagues conduct voter registration and education at their area high schools.

29. Additionally, in 2018, 949 of LWVWI's members and volunteers participated in election activities, and 6,580 hours of volunteer time were spent on election activities. LWVWI's local Leagues direct voters to use MyVote.wi.gov to register to vote, assist with changes of address and navigating MyVote and the DMV's website, direct voters to Vote411.org to find candidate information, and ensure voters have a valid form of photo ID to obtain and cast their ballots. If anything, these figures are undercounted or under-reported.

30.     In 2019, LWVWI spent approximately $10,385 on voter registration activities statewide, including work on registration form revision ($980), voter registration social media outreach ($294), National Voter Registration Day activities ($588), Disability Voter Registration Week ($196), voter registration trainings ($980), print materials for local Leagues ($4,326), mailing tablets to local Leagues ($21), and additional staff ($3,000).

31.     For 2020, LWVWI has already made some expenditures for voter registration activities and intends to make more.  The budget provides for the following estimated costs: National Voter Registration Day activities ($980), Disability Voter Registration Week ($588), voter registration trainings ($1,568), print materials for local Leagues ($4,000), voter registration social media outreach ($784), and additional estimated expenses ($6,000).  The total will be $13,920.

32.     LWVWI is the umbrella organization for 20 local Leagues across Wisconsin, including in Ozaukee, Waukesha, Milwaukee, and Dane counties, and works with and through these 20 local Leagues.  Members of the local Leagues are members of LWVWI, as well as the national League of Women Voters, and their efforts and work are part of local, state, and national operations and done on behalf of the state and national Leagues.  LWVWI offers guidance, resources, materials, trainings, and financing in support of the local Leagues and their activities, which include voter registration drives and, as can be seen from the above information on expenditures, other voter registration-related activities.  LWVWI serves tens of thousands of voters, through in-person voter registration assistance to complete online and paper registrations. LWVWI distributes voter information in the form of thousands of flyers, information cards, guides, and stickers. LWVWI will engage hundreds of thousands of individuals through its website

and social media platforms in the months prior to the November elections. LWVWI believes that these efforts contribute to high voter engagement and turnout in Wisconsin elections.

33.     The League of Women Voters of Dane County has conducted 182 voter registration events in the 2018-2019 period, registering 6,956 voters and answering 6,745 questions regarding voter registration or the state's voter ID law.  Regarding its plans for 2020, the Dane County League plans to continue voter registration efforts at college campuses, high schools, apartment complexes, libraries, food pantries, meal sites, neighborhood events, community centers, senior centers, medical centers, and area places of business.

34.     The League's high school voter registration team, one of several voter services teams in the League of Women Voters of Milwaukee County, focuses only on high schools in Milwaukee County and Waukesha County.  It has been to date a team of five outreach coordinators but it aims to expand.  They have been assisting high school students to register to vote for about four school years.  For the last two school years, this team has helped between 900 and 1000 students complete and submit voter registration forms. The team is active in about 25 public schools in the two counties.  Additionally, they teach students how to organize a voter registration event in their school and then support those students with expertise and educational materials.  The League's high school voter registration team interacts with principals, teachers, and staff to provide voting information.  They send out a newsletter to a list of about 300 school contacts and several hundred community members.  Once a voter registration event is scheduled, the team will recruit volunteers to assist, and those requests go out to a list of over 500 people.  This team expects to register between 1,000 and 1,500 students in 2020.

35.     In the 2016-2017 period, the League of Women Voters of Appleton visited 42 locations, had 119 volunteers, completed 153 mail-in registrations, completed 31 online

registrations, and provided 173 people with information on registration, absentee voting and/or the voter ID requirement.  In 2017-18, the Appleton League visited 23 locations, had 74 volunteers, completed 84 mail-in registrations, completed 100 online registrations, and provided 159 people with information on registration, absentee voting and/or the voter ID requirement.  For 2018-19, the Appleton League visited 44 locations, had 136 volunteers, completed 50 mail-in registrations, completed 84 online registrations, and provided 257 people with information on registration, absentee voting and/or the voter ID requirement.  And finally, from June 2019 through the present, the Appleton League logged 202.5 volunteer hours, 43 online registrations, 44 mail-in registrations, and provided 169 people with information on registration and/or ID requirements for voting.

36.     As can be seen from the above allegations, LWVWI devotes a substantial part of its year-round work to registering voters in furtherance of its mission to maximize participation in Wisconsin elections and defend the rights of eligible Wisconsin voters, and will consequently be injured by an immediate purge of 234,039 or 7 percent of Wisconsin's registered voters.  Part of LWVWI's core mission is to maximize eligible voter participation through its voter registration efforts and encourage civic engagement through registration and voting.  Permitting this purge to take effect without compliance with federal constitutional due process requirements and on the eve of multiple elections will impose significant burdens on LWVWI's interests and efforts in maximizing voter participation and civic engagement through voter registration drives.  It will force LWVWI to divert time, money, and other resources to *re-registering* thousands of voters in the 2020 election cycle.

37.     Kicking 234,039 registered Wisconsin voters off the rolls without adequate notice to voters and so soon before multiple elections would unravel the League's extensive, resource-

intensive work conducting voter registration drives throughout the state and add to the League's burden by forcing them to re-register eligible voters whose voter registration was cancelled without due process.  An endless cycle of cancellations made without providing the required due process would clearly burden the League's efforts to increase voter participation by adding eligible voters to the rolls and keeping them there.  This would be true, regardless of whether deactivation occurred after 30 days of a notice's mailing (the rule that will hold if the *Zignego* order based on Wis. Stat. § 6.50(3) is affirmed) or after the Commission's 12-to-24-month waiting period had elapsed without the voter taking the requisite action.

38.     Additionally, past experience shows that the ERIC list contains a substantial amount of unreliable information on residential address changes.   Wisconsin Elections Commission data reflects at least a 7.78 percent error rate in the 2017-2018 ERIC list.  A court order permitting error-prone deactivations of registered voters will inevitably add to LWVWI's work by requiring the organization to expend time, money, and other resources re-registering voters who were removed in error, regardless of the timeline state law sets for deactivation.

39.     Finally, LWVWI is also committed to protecting all eligible Wisconsin voters' rights, including the League's members, one of whom—Patricia Ann Villarreal—is also named as a Plaintiff in this action.  That includes preventing unlawful removal from the voter rolls.  Voters removed in error will have to wait in lines to register at polling places in upcoming elections in 2020 and present documentary proof of residence or make two trips to the polls because the ERIC letter led them to believe that they could merely confirm their addresses—rather than re-register—at the polls.

40.     Plaintiff Patricia Ann Villarreal is an eligible and registered Wisconsin voter.  Ms. Villarreal is a 64-year-old United States citizen and has never been convicted of a felony.  She also

has never had a court take away her right to vote.  Ms. Villarreal is a member of the League and attends meetings of, and works with, the League's Latinx Outreach Team.  They are working to plan voter registration activities in 2020 and trying to increase awareness in the Latinx community about voter registration and turnout.  She has lived at the same address in Milwaukee since June 2003—over sixteen years.  She has also been registered to vote at that address for throughout that time, and has consistently voted in federal, state, and local elections.  In November, Ms. Villarreal was mailed an ERIC letter at the residential address at which she has lived for over sixteen years.  The detachable postcard at the bottom included this exact same address, and the Milwaukee City Election Commission office's information appeared at the top and bottom of the letter.  This letter informed her that information from a government agency transaction indicated that her address had changed and suggested that she update her voter registration or verify that she still resides at that same address.  She was surprised, then puzzled and finally, suspicious of the letter.  Indeed, Ms. Villarreal thought the letter might be a scam, designed to intimidate her.  So, not understanding why she needed to update her registration or confirm her registration address and, given the fact that she had not moved since 2003, Ms. Villarreal tore up the letter and threw it away, without mailing back the confirmation postcard.  Ms. Villarreal has not updated her voter registration or voted in an election since then.

41.     Plaintiff Sasha Albrecht is an eligible and registered Wisconsin voter, who resides in the City of Milwaukee.  Ms. Albrecht is a 29-year-old United States citizen and has never been convicted of a felony.  She also has never had a court take away her right to vote.  In July 2019, Ms. Albrecht moved to a new residence in the City of Milwaukee, three blocks away from her prior residence; she did not move to a new municipality.  This fall, Ms. Albrecht received the 2019 ERIC letter in the mail.  She read the letter and understood its suggestions for updating or

confirming her registration, but did not understand the letter to mean that she could be removed from the rolls if she did not update or confirm her registration address. Ms. Albrecht did not think she needed to do anything in response to the letter to maintain her status as a registered voter.

42. Defendants Dean Knudson, Julie M. Glancey, Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, and Robert F. Spindell, Jr. are sued in their official capacities as the members of the Wisconsin Elections Commission.

43. Defendant Meagan Wolfe is sued in her official capacity as the Administrator of the Wisconsin Elections Commission.

## BACKGROUND

44. The Wisconsin Constitution provides that, "Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district." WIS. CONST. art. III, § 1; *see also* WIS. STAT. § 6.02(1) ("Every U.S. citizen age 18 or older who has resided in an election district or ward for 28 consecutive days before any election where the citizen offers to vote is an eligible elector.").

45. Wisconsin law requires an eligible elector to register in order to cast a ballot. *Id.* § 6.27. Eligible electors may register to vote in person or by mail until 5:00 p.m. on the third Wednesday before Election Day, or online until 11:59 p.m. on the third Wednesday before Election Day. *Id.* § 6.28(1). Eligible electors who miss this deadline may register at the municipal clerk's office until close of business on the Friday before Election Day, *id.* § 6.29(a)(2), or at the polls on Election Day. *See generally id.* § 6.55. Documentary proof of residence is required to register to vote at municipal clerk's offices during the early voting period and on Election Day at the polls. *Id.* § 6.34.

46.     Any registered voter may vote by absentee ballot. *See id.* § 6.20. However, requests to vote absentee must be made by mail by 5:00 p.m. on the fifth day before an election, or in person by the Sunday preceding an election. *Id*. § 6.86(1)(b).  Absentee ballots must be sent out by municipal clerks no later than the 47th day before each partisan primary and general election and no later than the 21st day before each other primary and election. *Id*. § 7.15(1)(cm).

47.     In 2015, the Wisconsin Legislature enacted Act 261, which directed the Commission to participate in ERIC's multi-state voter roll maintenance consortium. *See id.* § 6.36(1)(ae)1.  As part of its membership in ERIC, Wisconsin provides to ERIC information about current driver's license and ID holders and registered voters, which ERIC then compares to records from other member states and national sources like the U.S. Postal Service's National Change of Address list.  Ex. A, Mar. 11, 2019 Commission Memorandum, at 2.  After the matching is complete, ERIC returns a list of voters who may have moved or died to the state. *Id.*

48.     In 2017, the ERIC list indicated that 282,448 registered voters had moved within the state. *Id.* at 3.  Of these voters, 6,153 had not moved and confirmed their addresses. *Id*. Another 12,133 had their registrations reactivated. *Id.* at 4.  A further 5,984 voters used the Supplemental Movers Poll List to confirm their registration addresses at the polls throughout elections from April to November of 2018. *Id.*  After raising concerns about the reliability of the 2017 movers list, clerks or commissions in three municipalities, including the City of Milwaukee, reactivated a total of 38,430 voters, 2,357 or 6.87 percent of whom voted at the addresses listed on their registrations. *Id.* at 5.  All told, this reflected an error rate of at least 7.78 percent of the 341,855 voters on the ERIC list.

49.     In March 2019, the Commission issued a set of recommendations for notifying voters on the 2019 ERIC list believed to have moved within the state, including the

recommendation that voters on the list be granted at least one year to update their registration (if they have moved) or confirm their address (if their inclusion on the ERIC list was in error). *Id.* at 8.[3]

50.     In 2019, ERIC identified 234,039 voters believed to have moved out of their municipality and sent this list to the Commission.  Ex. D, Wisconsin Elections Commission, *Excerpt from December 2, 2019 Agenda Documents*, *Wisconsin's Electronic Registration Information Center (ERIC) Movers Update*, at 1 (Dec. 2, 2019).[4]  Municipal clerks mailed letters to these voters between October 9 and 11, 2019.  *Id.*

51.     The letter informed voters that they could update their address online at myvote.wi.gov or at the polls, or by submitting a paper registration form to their municipal clerk. *See* Ex. E, Wisconsin Elections Commission, *Excerpt from September 24, 2019 Agenda Documents*, 2019 ERIC Letter, at 3 (Sept. 24, 2019).  The letter also informed voters that they could confirm their addresses, if they had not moved, by confirming their address online through myvote.wi.gov or voting in the next election, or by mailing back the detachable postcard located at the bottom of the notification.  *Id.*  The next elections in Wisconsin will be held on February 18, 2020.

---

[3] There is pending state litigation that seeks to determine whether Wis. Stat. § 6.50(3) requires these voters to be removed within 30 days of the mailing of a notification from the Commission, requesting that they update or confirm their registration address. *Zignego v. Wisconsin Elections Commission*, Case No. 2019-CV-449 (Ozaukee County Circuit Court, Branch 1).  The due process claim in Count 1 of this Complaint is asserted, regardless of whether the mandamus order in *Zignego* is affirmed or reversed on appeal, *i.e.* regardless of the timeline set by state statutes or state court decisions for removal of ERIC-identified voters from the rolls.  The due process claim in Count 2 of this Complaint, however, does rely on the state court's ordering of removal following a 30-day waiting period.

[4] The full record of the agenda documents is available on the Wisconsin Elections Commission's website at https://elections.wi.gov/sites/elections.wi.gov/files/2019-11/Open%20Session-%20December%20Final.11.26.19.pdf.

52.     Voters who chose to confirm the address associated with their voter registration records by returning the detachable postcard were required to sign a statement: "I, [voter's name], certify I still live at [voter's address] and want to keep my voter registration active in Wisconsin." *Id.* "Active" is a legal term of art and does not adequately inform a voter that they will be removed from the rolls if they fail to take one of the specified actions in response to the letter.

53.     The ERIC letter did not explain the consequences of failing to respond to or otherwise take one of the enumerated actions: removal from the voter rolls. *Id.* It also did not provide voters with a deadline for responding or taking one of the enumerated actions. *Id.*

54.     On November 13, 2019, three Wisconsin voters brought a state claim in the Circuit Court of Ozaukee County, alleging that state law required the removal of voters on the 2019 ERIC list who did not respond to the ERIC letter within 30 days of the mailing of the letter. On December 13, 2019, ruling from the bench, the state court granted the plaintiffs' writ of mandamus and ordered the immediate cancellation of the ERIC list voters' registrations. *See Zignego v. Wisconsin Elections Commission*, Case No. 2019-CV-449 (Ozaukee County Circuit Court, Branch 1). The state court issued the writ of mandamus on December 17, 2019. *See* Ex. F.

55.     Plaintiff LWVWI moved to intervene as a defendant in the Ozaukee County action. In its brief in support of its motion to intervene the League argued that "burdening voters with the need to re-register per se violates the First and Fourteenth Amendments to the U.S. Constitution when their removal was erroneous and unlawful," and that "[i]f denied intervention here, the League may well be compelled to bring affirmative litigation *against the current Defendants* to prevent or redress the unlawful removal of registered voters." (Emphasis in original) At the December 13, 2019 oral argument on the League's motion to intervene, the League's counsel reiterated the League's federal constitutional due process claims, arguing that the 2019 mailing is

"deficient" and "violates constitutional requirements of due process," which counsel further argued "would require a new notice to be mailed out before any removal from the rolls." Ex. C, Hr'g Tr. at 25:16-21.

56.     The Circuit Court judge noted the League's arguments that the 2019 Mailing violates the U.S. Constitution, stating in his ruling on the League's motion to intervene that the League "talk[s] in terms of due process violations and constitutional issues . . . They are talking a much more complex, much more involved litigation than what I am looking at and what has been brought by the plaintiffs." *Id*. at 30:21-31:1.  The Circuit Court judge continued: "[I]f the League were this concerned about it, they should have done this on their own, in a separate lawsuit, and this is not the lawsuit to do it," *id*. at 35:7-9, denying the League's motion to intervene, and further suggesting "[i]f they want to file an action that would have the normal discovery provisions and the discovery process and motions and witness lists and things like that, that is what they should do." *Id*. at 33:15-18.

57.     In the December 13, 2019 hearing, after denying the League's motion to intervene, the Circuit Court issued a bench ruling granting the plaintiffs' petition for a writ of mandamus and ordered the immediate cancellation of the ERIC list voters' registrations.

58.     At the December 13 hearing, counsel for the defendants in that action (who are also counsel for the same Defendants here) stated that the ERIC letter "does not provide any notice of deactivation, in thirty days or otherwise . . . this would change the status quo, deactivate registered electors without any notice." *Id*. at 58:23-59:2.  The Commission's Counsel further explained that:

> [The Commissioners] weren't planning to deactivate these – these voters . . . Under the ERIC mover agreement, they have to reach out to voters and let them know that there was – there's been some indication that they might have moved . . . [T]hat's all that this notice was doing. It was not saying in thirty days you're gonna be deactivated, it wasn't saying at some point you're gonna be deactivated, it was saying here are the steps you can take to . . . update the voter rolls, help us update the voter rolls.

*Id*. at 60:4-17; *see also id*. at 58:22-59:2 ("That is a complete change of the status quo . . . because the 2019 mailing . . . was a new process, it – it does not provide any notice of deactivation or otherwise . . . so the . . . this would – this would change the status quo, deactivate registered electors without any notice.").  Defendants' Counsel also estimated that some 14,000 voters may have been erroneously included on the 2019 ERIC list, *id*. at 56:2-6, and argued that the status quo would be best served by not removing voters from the rolls at this time.  *Id*. at 58:14-59:2.

## CLAIMS

## COUNT ONE
### (All Plaintiffs)
### (Violation of Procedural Due Process Requirements of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983)

59.      The factual allegations contained in paragraphs 1 through 58 are incorporated into Count One, as though fully set forth herein.

60.      The Due Process Clause of the Fourteenth Amendment prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV.  At a minimum, "[t]o meet the requirements of due process, the state must afford notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Morrell v. Mock*, 270 F.3d 1090, 1095 (7th Cir. 2001) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

61.      Courts tasked with reviewing procedural due process claims face two questions: "(1) is there a property or liberty interest protected by due process; and (2) if so, what process is due, and when must that process be made available?"  *Simpson v. Brown Cty.*, 860 F.3d 1001, 1006 (7th Cir. 2017).  Answering these questions requires balancing three interests: "first, the private interest at stake; second, the risk of erroneous deprivation and the value, if any, of

additional procedural safeguards; and third, the government's countervailing interests." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

62.     The Seventh Circuit has held that due process requires pre-deprivation procedures except in cases of emergencies or when the government conduct at issue is "random and unauthorized." *Simpson*, 860 F.3d at 1010.  Neither of those conditions is met here, so post-deprivation notice of removal cannot satisfy minimum due process requirements.  The fact that Wisconsin law offers erroneously-removed voters the opportunity to re-register in various ways, including at the polls on Election Day, does not cure the due process violation caused by the wrongful cancellation of their registrations.

### Statutory Entitlement

63.     A liberty or property interest that is governed by due process can be created by the Constitution or "may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Courts analyze whether a statutory entitlement existed prior to the notice and process afforded and prior to the deprivation.

64.     Wisconsin law creates a statutory entitlement in one's voter registration, by guaranteeing the right to register and cast a ballot to every U.S. citizen above the age of 18 who is a resident of the state and who registers to vote in accordance with the procedures established under state law and regulations.  Wis. Stat. § 6.27 ("Each elector shall register under this chapter before voting in any election . . . ."); *see also* Wis. Stat. § 6.29 ("No names may be added to a registration list for any election after the close of registration, except as authorized under this section or s. 6.55(2) or 6.86(3)(a)2. Any person whose name is not on the registration list but who is otherwise a qualified elector is *entitled to vote at the election upon compliance with this section*, if the person complies with all other requirements for voting at the polling place.") (emphasis

added).  Eligible, registered voters also enjoy an "individual and personal" right to vote under Wisconsin law.  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).  Wisconsin law entitles any registered voter to cast ballots in any way the voter qualifies to vote.  As an example, all registered Wisconsin voters are entitled to vote by mail-in absentee ballot, if the voter files a request by the deadline mandated in state law.  *See* WIS. STAT. § 6.20.

### Risk of Erroneous Deprivation

65.     Serious deficiencies in the letters sent to voters on the 2019 ERIC list have created a risk of erroneous deprivation of registered voters' statutory entitlements to their registration status and to cast a vote by any method for which they qualified.  This risk is magnified by the documented error rate in the ERIC lists provided to Wisconsin, including the 2019 ERIC list. Defendant Commission Chairman Dean Knudson has stated that already about 1,170 voters have communicated to say they were "false positive match[es]"—that they have not in fact moved.[5]

66.     By the admission of Defendants' own counsel, the 2019 ERIC letter failed to provide adequate notice.  The letter did not adequately explain to voters the consequences of failing to respond or otherwise take one of the enumerated actions; nor did it provide a deadline for responding or taking one of the enumerated actions, because it was not intended for this purpose. It was meant merely to "help" election officials update the rolls or confirm their accuracy, and did not communicate that their registration could be deactivated.

67.     This wholly inadequate provision of notice has increased the likelihood that voters have not taken and will not take the steps needed to confirm their addresses, and in turn, the

---

[5] PBS Wisconsin, Here and Now, *WILL Sues State Elections Agency Over Voter Roll Maintenance*, at 4:35, *available at* https://pbswisconsin.org/wpt-video/here-and-now/will-sues-state-elections-agency-over-voter-roll-maintenance/.

likelihood that their registrations will be cancelled.  Further, this lack of adequate notice has increased the likelihood that they will be denied their right to vote because they are unaware their registrations have been cancelled and have been led to believe they can vote in person without re-registering and without the proof of residence needed to re-register.  Lastly, this lack of adequate notice also increased the likelihood that voters will be unable to vote in the manner to which they are entitled under state law.[6]

68.     Plaintiff LWVWI will also have to redouble its voter registration efforts due to these deficiencies in the ERIC letter.  In 2018, a general election year, it spent over $12,000 and 6,500 volunteer hours conducting outreach and helping approximately 12,582 voters register to vote or update their registrations.  Defendants have offered no evidence that they have taken steps to ensure that the 2019 ERIC list does not have the same error rate as the 2017-2018 ERIC list (7.78 percent), meaning that Plaintiff LWVWI will have to work to re-register over 18,000 voters in the eight weeks before the February 2020 election—or 1.4 times the number of voters it registered across twelve months in 2018.

## Government Interest

69.     Defendants cannot advance any interests that outweigh the risk of erroneous deprivation.  In assessing governmental defendants' interests, courts also consider "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Riano v. McDonald*, 833 F.3d 830, 834 (7th Cir. 2016) (quoting *Mann v. Vogel*, 707 F.3d 872, 879 (7th Cir. 2013)).  Plaintiffs do not dispute the Defendants' interest in

---

[6] For instance, many on the ERIC list who are ultimately deactivated are at risk of being deprived of their right to cast an absentee ballot, as many voters will probably not learn their registrations have been cancelled until filing the request to vote absentee; for people with physical disabilities, if they miss the deadline to re-register online, they may not be able to cast a ballot at all or their right to vote will be severely burdened.

conducting voter list maintenance, fair election administration, or compliance with state law.  But they have an equally weighty interest in meeting federal constitutional requirements, which they cannot do if they move forward with the removals, having failed to provide adequate pre-deprivation notice.

70.     If anything, moving forward with the removal process would increase the burden on Defendants and county election officials.  There are now less than two months before the spring primary election and U.S. Congressional District 7 special primary election on February 18, 2020.  There are also elections scheduled in April, August, and the 2020 presidential and general election in November.  Carrying out the immediate removal of 234,039 registered Wisconsin voters would require Defendants and their agents to balance preparing ballots and polling places, recruiting and training poll workers, and other critical election activities with removing and re-registering voters statewide.  The prospect of having to re-register voters at the polls on Election Day will increase the potential for long lines, congested polling places, and administrative problems, thereby creating more work for the Defendants' agents and undermining election administration.

71.     For the foregoing reasons, Defendants have violated Plaintiffs' federal constitutional rights to procedural due process.  Whether the deprivations of statutory entitlements in voter registration occurs within 12 to 24 months, as set forth in the Commission's preexisting policy, or within thirty days of a notice letter's mailing as ordered by the Court in *Zignego v. Wisconsin Elections Commission*, is immaterial, because no adequate notice was provided.

72.     At all relevant times, Defendants have acted under color of state law.

73.     Defendants have deprived and will continue to deprive Plaintiffs and their members of their right to be afforded adequate notice and an adequate opportunity to be heard prior to the deactivation of their registration—the minimum requirements of procedural due process.  This

right is guaranteed to Plaintiffs by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## COUNT TWO
### (League of Women Voters of Wisconsin)
### (Detrimental Reliance in Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983)

74.     The factual allegations contained in paragraphs 1 through 58 are incorporated into Count Two, as though fully set forth herein.

75.     When "an officially-sponsored election procedure" is "in its basic aspect . . . flawed" and unfair, it violates due process. *Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978) (citing *Briscoe v. Kusper*, 435 F.2d 1046, 1054-56 (7th Cir. 1970)).  Federal courts have made clear that election rules must be communicated to voters and must not be changed to the detriment of voters who rely on the first set of rules.  *See id.*; *Hoblock v. Albany Cty. Bd. of Elections*, 487 F. Supp. 2d 90, 94-96 (N.D.N.Y. 2006) (holding that voters who should have been required to reapply to receive absentee ballots under state law reasonably relied on election officials' erroneous issuance of absentee ballots and suffered a deprivation of their due process rights when election officials subsequently refused to count their votes); *Williams v. Sclafani*, 444 F. Supp. 906, 911-13 (S.D.N.Y. 1978) (holding that New York City council candidate's detrimental reliance on erroneous Board of Elections guidance that candidate petition signatures could be gathered simultaneously from new registrants could not be used to invalidate his candidacy).

76.     The 2019 ERIC letter also violates due process because it has induced registered Wisconsin voters who have not moved from the residential address listed on the 2019 ERIC letter mailed to them, to rely to their detriment on Defendants' representation that they could confirm their registration addresses by voting in "the next election." *See* Ex. E, 2019 ERIC Letter ("If you still reside at this address, please use one of the following three options below to confirm: . . . Vote

at the next election . . .").  The letter did not specify whether this was the next election that occurred or the next election in which the voter cast a ballot.  Absent a specific date, a reasonable voter would have understood "the next election" to mean the next election in which they voted.

77.     If the *Zignego v. Wisconsin Elections Commission* mandamus order stands, then Defendants will have changed the rules and procedures regarding voter registration in Wisconsin elections.  Having induced reliance on the first set of rules, they have now changed them pursuant to a state court's order and will deprive duly-registered Wisconsin voters of their voter registration status.

78.     Removing voters from the rolls before they can avail themselves of an option the Commission represented would be available, constitutes an unconstitutional about-face in the state's election rules and procedures, in violation of the Due Process Clause.  *Griffin*, 570 F.2d at 1078.

79.     Plaintiff LWVWI brings this claim on behalf of its members who have not moved and received a 2019 ERIC letter.  It also asserts this claim because this change in election laws will cause people to lose their registration status and force LWVWI to divert time, resources, and money to re-register voters who have not moved from the residential address listed on the 2019 ERIC letter mailed to them and who are forced off the rolls due to Defendants' changes in the voter registration rules and changes in their representations as to those rules.

80.     In this way, the removal of voters who have not moved from the residential address listed on the 2019 ERIC letter mailed to them would violate their due process rights against changes to election rules upon which voters rely to their detriment.

81.     Because the state has induced voters who have not moved from the residential address listed on the 2019 ERIC letter mailed to them to rely to their detriment on Defendants'

representations that they could confirm their registration addresses by voting in "the next election," and because Defendants cannot and do not know a priori who on the 2019 ERIC list has not moved, Defendants cannot constitutionally remove <u>any</u> of the 2019 ERIC list voters from the rolls, until such time as Defendants cure the detrimental reliance they induced.

82.   At all relevant times, Defendants have acted under color of state law.

83.   Defendants have deprived and will continue to deprive Plaintiffs and their members of their right to be free from election law changes upon which voters rely to their detriment.  This right is guaranteed to Plaintiffs by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

(a) Assume jurisdiction over this matter;

(b) Declare that Defendants' imminent deactivation of 234,039 registered Wisconsin voters without affording adequate notice and an adequate opportunity to respond violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, and declare that Defendants' imminent deactivation of 234,039 registered Wisconsin voters—Defendants having induced registered Wisconsin voters who have not moved from the residential address listed on the 2019 ERIC letter mailed to them to rely to their detriment on Defendants' representation that they could confirm their registration addresses by voting in "the next election"—violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution;

(c) Issue a temporary restraining order and a preliminary injunction enjoining Defendants from deactivating, canceling, or otherwise changing the registration status of any registered Wisconsin voter on the basis of their presence on the 2019 ERIC list until such time as the

permanent injunction requested below is entered, unless that voter contacts the Wisconsin Elections Commission or any municipal clerk's office to confirm their registration address or to inform the Commission or any municipal clerk's office that they have moved to another state;

(d) Issue a permanent injunction that prohibits Defendants from:

(1) removing any registered Wisconsin voter from the list of eligible voters on the basis of the voter's presence on the 2019 ERIC list, unless Defendant issues new notice letters to all registered Wisconsin voters on the 2019 list, *excluding* any voter who has already confirmed that deactivation is accurate, or already confirmed or updated the address associated with their voter registration at any time after the Wisconsin Elections Commission, Wisconsin DMV, and other agencies completed the submission to ERIC of all data required by the ERIC membership agreement;

(2) removing any registered Wisconsin voter from the list of eligible voters on the basis of their presence on the 2019 ERIC list, unless Defendant ensures that any new notice letters sent pursuant to paragraph (1) above contain adequate and clear explanations and instructions on (i) why the notice letter is being sent, (ii) how the voter can confirm or update the address associated with their voter registration, (iii) what will happen if the voter fails to take one of the actions in response to the notice letter to confirm or update the address associated with their voter registration, and (iv) the deadline under state law by which the voter must take one of the actions in response to the notice letter to confirm or update the address associated with their voter registration, to be approved by this Court;

(3) removing any registered Wisconsin voter from the list of eligible voters on the basis of their presence on the 2019 ERIC list, unless Defendant ensures that any new notice

letters sent pursuant to paragraph (i) above are written in clear language, in English and translate it into any language required by Section 203 of the Voting Rights Act;

(4) deactivating any registered Wisconsin voter from the list of eligible voters on the basis of their presence on the 2019 ERIC list, unless Defendant complies with the procedures outlined for voters in a new notice letter mailed out pursuant to this permanent injunction, and from deactivating or canceling any registered Wisconsin voter except in compliance with the state law-mandated instructions described in such new notice letter; and

(5) removing any of the voters on the 2019 ERIC list from the rolls on the basis of their presence on the 2019 ERIC list, until such time as Defendants cure the detrimental reliance they induced.

(e) Retain jurisdiction so that any new notice letter can be reviewed and approved by this Court;

(f) Grant Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and as otherwise permitted by law; and

(g) Grant such other relief as this Court deems just and proper.

DATE: December 17, 2019                    Respectfully submitted,

                                           */s/ Jon Sherman*

                                           Jon Sherman*
                                           D.C. Bar No. 998271
                                           Cecilia Aguilera*
                                           D.C. Bar No. 1617884
                                           Michelle Kanter Cohen*
                                           D.C. Bar No. 989164
                                           Fair Elections Center
                                           1825 K St. NW, Ste. 450
                                           Washington, D.C. 20006
                                           jsherman@fairelectionscenter.org
                                           caguilera@fairelectionscenter.org
                                           mkantercohen@fairelectionscenter.org
                                           (202) 331-0114

                                           Douglas M. Poland
                                           State Bar No. 1055189
                                           David P. Hollander
                                           State Bar No. 1107233
                                           Rathje Woodward LLC
                                           10 E Doty Street, Suite 507
                                           Madison, WI 53703
                                           Phone:  608-960-7430
                                           Fax:  608-960-7460
                                           dpoland@rathjewoodward.com
                                           dhollander@rathjewoodward.com

                                           *Counsel for Plaintiffs*

                                           *Motions for pro hac vice admission to be
                                           filed*