IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF WISCONSIN, PATRICIA ANN VILLARREAL, SASHA ALBRECHT, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 19-cv-1029-jdp |
| DEAN KNUDSON, JULIE M. GLANCEY, ROBERT F. SPINDELL, JR., MARK L. THOMSEN, ANN S. JACOBS, MARGE BOSTELMANN, in their official capacity as members of the Wisconsin Elections Commission, MEAGAN WOLFE, in her official capacity as the Administrator of the Wisconsin Elections Commission, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR A PRELIMINARY INJUNCTON AND EXPEDITED DISCOVERY**

### INTRODUCTION

Wisconsin participates in the multi-state voter registration list maintenance consortium known as the Electronic Registration Information Center ("ERIC"). Of 28 states plus D.C., it is the only state that—within 30 days of a notice's mailing—will remove a registered Wisconsin voter from the rolls if there is "reliable information" that they have moved merely to a different municipality within the state. Wis. Stat. § 6.50(3). All of the other states in ERIC are either subject to the National Voter Registration Act's requirement to provide notice and wait for two general elections with a federal office to pass before removing from the rolls a registered voter who appears

to have moved, will simply automatically update a voter registration record if the voter has moved anywhere within the state, or both.

The singularly unique nature of Wisconsin election law make it extremely important that, as the Due Process Clause in the Fourteenth Amendment to the U.S. Constitution requires, the Commission's voter roll maintenance rules and procedures afford registered Wisconsin voters adequate and clear notice of officials' intention to remove them from the rolls, the steps voters need to take to remain registered to vote, the consequences of failing to take action, and the deadline for any such action.  It is also extremely important that, as required by law, these voting rules and procedures not be communicated to voters and then suddenly changed close to elections, causing voters to rely on the first set of rules to their detriment.

Unfortunately, the letter sent to these 234,039 registered Wisconsin voters identified by ERIC as potential movers did not give them notice that they were facing removal from the rolls; nor did it notify them of the timeline within which to take action to remain registered to vote in Wisconsin.  These voters were deprived of their right to procedural due process, which, at a bare minimum, requires adequate notice and an adequate opportunity to be heard *prior to* the deprivation of a right or statutory entitlement like continuously maintaining status as a registered voter.  In a related state court hearing last Friday, Defendants' Counsel at the Wisconsin Department of Justice conceded this due process violation: "[The 2019 ERIC letter] does not provide any notice of deactivation, in thirty days or otherwise . . . [an injunction or mandamus order] would change the status quo, deactivate registered electors without any notice."

The 2019 ERIC letter only gave registered voters mere suggestions to update or confirm their registration address.  The letter represented that voters who have not moved from the residential address listed on the letter may confirm their address by voting in "the next election,"

in which case their registration would not be cancelled.  However, the letter did not specify whether this was the next election that occurred or the next election in which the voter cast a ballot.  Absent a specific date, a reasonable voter would have understood "the next election" to mean the next election in which they voted.  These voters have been deprived of their right to due process because many will rely, to their detriment, on the Commission's representation that they can confirm their registration address by voting in "the next election."

Plaintiffs League of Women Voters of Wisconsin ("League" or "LWVWI"), Patricia Ann Villarreal, and Sasha Albrecht (collectively, "Plaintiffs") respectfully request that these due process violations be remedied by this Court's entry of a preliminary injunction to halt the deactivation of registered Wisconsin voters on the 2019 ERIC list.  This preliminary injunction will preserve the status quo until the resolution of this case and the entry of a permanent injunction requiring Defendants—in order to proceed with any removals based on the 2019 ERIC list—to mail out new notice letters.  To comply with due process requirements, these new notice letters must adequately and clearly inform registered Wisconsin voters on the 2019 ERIC list of the Commission's intent to remove them from the voter rolls, the reason for this voter list maintenance action, the steps they need to take to avoid that outcome, including clearly explaining the confirmation and voter registration update processes, the consequences of failing to take action, and the timeline for deactivation if they fail to take action.  The deadline for any response and corresponding timeline for deactivation will be set by state law.  The state court case, *Zignego v. Wisconsin Elections Commission*, Case No. 2019CV000449 (Ozaukee County Circuit Court, Branch 1), will resolve whether Wis. Stat. § 6.50(3) requires these voters to be removed within 30 days of the mailing of a notification from the Wisconsin Elections Commission, requesting that they update or confirm their registration address.  The due process claims in Counts 1 and 2 of this

Complaint are asserted, regardless of whether the mandamus order in *Zignego* is affirmed or reversed on appeal, *i.e.* regardless of the timeline set by state statutes or state court decisions for removal of ERIC-identified voters from the rolls.  The resolution of this case does not turn on how Wis. Stat. § 6.50(3) is interpreted; it is solely concerned with Defendants' due process violations under the U.S. Constitution.

## STATEMENT OF FACTS

1.      The Wisconsin Constitution provides that, "Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district." WIS. CONST. art. III, § 1; *see also* Wis. Stat. § 6.02(1) ("Every U.S. citizen age 18 or older who has resided in an election district or ward for 28 consecutive days before any election where the citizen offers to vote is an eligible elector.").

2.      Wisconsin law requires an eligible elector to register in order to cast a ballot.  Wis. Stat. § 6.27.

3.      Eligible electors may register to vote in person or by mail until 5:00 p.m. on the third Wednesday before Election Day, or online until 11:59 p.m. on the third Wednesday before Election Day.  Wis. Stat.  § 6.28(1).

4.      Eligible electors who miss this deadline may register at the municipal clerk's office until the close of business on the Friday before Election Day, Wis. Stat. § 6.29(a)(2), or at the polls on Election Day.  *See generally* Wis. Stat. § 6.55.

5.      Documentary proof of residence is required to register to vote at municipal clerk's offices during the early voting period and on Election Day at the polls.  Wis. Stat. § 6.34.

6.      Any registered voter may vote by absentee ballot.  Wis. Stat. § 6.20.  However, requests to vote absentee must be made by mail by 5:00 p.m. on the fifth day before an election, or in person by the Sunday preceding an election.  Wis. Stat. § 6.86(1)(b).

7.      Municipal clerks must mail out absentee ballots by no later than the 47th day before each partisan primary and general election and no later than the 21st day before each other primary and election.  Wis. Stat. § 7.15(1)(cm).

8.      Wisconsin is one of only six states that is exempt from the entirety of the National Voter Registration Act (the "Motor Voter Law"), 52 U.S.C. §§ 20501 *et seq*.  *See* 52 U.S.C. § 20503(b)(2).

9.      Of the 28 states and D.C. participating in ERIC, only Wisconsin and Minnesota need not comply with the federal requirement to provide notice and wait for two general elections with a federal office to pass before removing from the rolls a registered voter who appears to have moved according to the U.S. Postal Service's National Change of Address ("NCOA") information. 52 U.S.C. §§ 20507(b)(2), 20507(d)(1)(B).  This is because both states have Election Day registration.  Wis. Stat. § 6.55; Minn. Stat. § 201.061 sub. 3.

10.     But Wisconsin's voter list maintenance laws differ from Minnesota's laws as well. In Wisconsin, a registered voter must be removed from the poll books within 30 days of the date on which the Commission mails the letter if there is "reliable information" that they have moved outside their municipality, Wis. Stat. § 6.50(3), whereas Minnesota only requires a registered voter's removal from the rolls if there is evidence the voter has moved to another state.  Minn. Stat. § 201.12(3).  Minnesota automatically updates its voter rolls for a change of address *within the state*, Minn. Stat. § 201.12(2.), while Wisconsin's statute requires that a voter's registration record be automatically updated for a change of address *within the same municipality*.  Wis. Stat.

§ 6.50(3).  Wisconsin is, therefore, the only ERIC member state that—within 30 days of a notice's mailing—will remove a registered voter who has merely moved to a different municipality within the state.

11.     In 2015, the Wisconsin Legislature enacted a law requiring the Wisconsin Elections Commission ("WEC" or "the Commission") to join ERIC, a non-profit organization run by and for twenty-eight states and the District of Columbia, which works to improve the accuracy of state voter rolls and to identify individuals who are eligible to vote but are not registered.  Wis. Stat. § 6.36(1)(ae)1; Declaration of Douglas M. Poland ("Poland Decl."), Ex. A, Wisconsin Elections Commission Memorandum, *Assessment of Wisconsin's Electronic Registration Information Center (ERIC) Participation*, at 1–2 (Mar. 11, 2019).

12.     ERIC ingests voter registration files and government transaction data that the member states provide, namely from Departments of Motor Vehicles ("DMVs"), and uses its matching methodology to identify registered voters on the rolls who appear to have moved within or to a different state, or who appear to have died while out of state, as well as individuals who appear to be eligible but unregistered to vote.  Poland Decl., Ex. A, Mar. 11, 2019 Commission Memorandum, at 1–2.

13.     ERIC then aggregates this information about apparent movers and compiles it into an electronic record that it provides to the Commission (the "list" or "ERIC list").  Poland Decl., Ex. A, Mar. 11, 2019 Commission Memorandum, at 2.

14.     ERIC provided its first list to Wisconsin in late 2017 and its second earlier this year.  Poland Decl., Ex. A, Mar. 11, 2019 Commission Memorandum, at 2–3.

15.     The Commission uses the ERIC list, in part, to identify those registered Wisconsin voters who appear to have changed their residential address from the address at which they are

registered to vote, and to mail a letter to those voters suggesting they either confirm that their address is current, or if they have moved within the State of Wisconsin, to register to vote at their new address. Poland Decl., Ex. A, Mar. 11, 2019 Commission Memorandum, at 1–3.

16.     In 2017, the ERIC list indicated that 282,448 registered voters had moved within the state. Poland Decl., Ex. A, Mar. 11, 2019 Commission Memorandum, at 3. Of these voters, 6,153 had not moved and confirmed their addresses. *Id*. Another 12,133 had their registrations reactivated by the Commission. *Id*. at 4. A further 5,984 voters used the Supplemental Movers Poll List to confirm their registration addresses at the polls throughout elections from April to November of 2018. *Id*. After raising concerns about the reliability of the 2017–2018 ERIC list, clerks or commissions in three municipalities, including the City of Milwaukee, reactivated a total of 38,430 voters, 6.87 percent of whom or 2,357 voted at the addresses listed on their registrations. *Id*. at 5. All told, this reflected an error rate of at least 7.78 percent of the 341,855 voters on the 2017–2018 ERIC list. This figure is based on Plaintiffs' counsel's calculation.

17.     In March 2019, the Wisconsin Elections Commission issued a set of recommendations for notifying voters on the 2019 ERIC list believed to have moved within the state, including the recommendation that voters on the list be granted at least one year to update their registration (if they have moved) or confirm their registration address (if their inclusion on the list was in error). Poland Decl., Ex. A, Mar. 11, 2019 Commission Memorandum, at 8.

18.     In June 2019, the Commission adopted a new policy of waiting 12 to 24 months to deactivate registered Wisconsin voters on the 2019 ERIC list. Poland Decl., Ex. B, Wisconsin Elections Commission Memorandum, *Wisconsin's Electronic Registration Information Center (ERIC) Movers Analysis* (Jun. 11, 2019), at 3–5.

19.    This year, ERIC identified 234,039 voters believed to have moved out of their municipality and sent this list to the Commission.  Poland Decl., Ex. C, Wisconsin Elections Commission, *Excerpt from December 2, 2019 Agenda Documents*, *Wisconsin's Electronic Registration Information Center (ERIC) Movers Update*, at 1 (Dec. 2, 2019).

20.    Between October 9 and 11 2019, the Commission mailed out letters to all 234,039 registered Wisconsin voters on the 2019 ERIC list (the "2019 ERIC letter").  Poland Decl., Ex. C, Wisconsin Elections Commission, *Excerpt from December 2, 2019 Agenda Documents*, *Wisconsin's Electronic Registration Information Center (ERIC) Movers Update*, at 1 (Dec. 2, 2019).

21.    The letter informed voters that they could update their address online at myvote.wi.gov or at the polls, or by submitting a paper registration form to their municipal clerk. *See* Poland Decl., Ex. D, *Excerpt from September 24, 2019 WEC Agenda Documents*, 2019 ERIC Letter, at 53.  The letter also informed voters that, if they had not moved, they could confirm their addresses by confirming their address online through myvote.wi.gov, by voting in the next election, or by mailing back the detachable postcard located at the bottom of the notification. *Id.* The ERIC letter did not explain the consequences of failing to respond to or otherwise take one of the enumerated actions: removal from the voter rolls. *Id.*  It also did not provide voters with a deadline for responding or taking one of the enumerated actions. *Id.*

22.    Voters who chose to confirm the address associated with their voter registration records by returning the detachable postcard were required to sign a statement: "I, [voter's name], certify I still live at [voter's address] and want to keep my voter registration active in Wisconsin." *See* Poland Decl., Ex. D, *September 24, 2019 WEC Agenda Documents*, 2019 ERIC Letter, at 53.

23.     The 2017 ERIC letter articulated that a voter would be deactivated within 30 days of the mailing and the voter would need to re-register if they took no action: "If you do not register at your new address at this time and do not return the continuation card within 30 days, you will need to re-register before you are able to vote."  Poland Decl., Ex. E, Attachment to October 29, 2017 Wisconsin Elections Commission Memo: ERIC List Maintenance Mailing to Voters Who Have Moved, ERIC Postcard Sample In-State Movers (Oct. 29, 2017).

24.     In the 2017–2018 ERIC voter list maintenance period, the Commission found that the overwhelming majority—82.6 percent—of the "movers" on the ERIC list were in-state movers.  Poland Decl., Ex. A, Mar. 11, 2019 WEC Memorandum, at 3.  The memorandum did not further disaggregate those statistics by inter- or intra-municipality movers.  *Id.*  The Commission uses the ERIC list, in part, to identify those registered Wisconsin voters who appear to have changed their residential address from the address at which they are registered to vote, and to mail a letter to those voters suggesting they either confirm that their address is current, or if they have moved within the State of Wisconsin, to register to vote at their new address.

25.     On November 13, 2019, three Wisconsin voters filed a state claim in the Circuit Court of Ozaukee County, alleging that state law required the removal of voters on the 2019 ERIC list who did not respond to the ERIC letter within 30 days of the mailing of the letter.  *See* Poland Decl., Ex. F, Complaint, *Zignego v. Wisconsin Elections Commission*, Case No. 2019CV000449 (Ozaukee County Circuit Court, Branch 1).

26.     On December 13, 2019, ruling from the bench, the state court in *Zignego v. Wisconsin Elections Commission* granted the plaintiffs' writ of mandamus, ordered the immediate cancellation of the 234,039 ERIC list voters' registrations, and denied a stay of its order.  Poland Decl., Ex. G, Transcript of December 13, 2019 Hearing on Motion for Temporary Injunction or,

in the Alternative, a Writ of Mandamus, *Zignego v. Wisconsin Elections Commission*, Case No. 2019CV000449 (Ozaukee County Circuit Court, Branch 1) ("Hr'g Tr."), 67:11–79:19.  The Court issued the writ of mandamus on December 17, 2019, compelling the Commission to deactivate all of the ERIC list voters within 30 days of the Commission's mailing of the 2019 ERIC letters, in keeping with the Court's interpretation of Wis. Stat. § 6.50(3).  *See* Poland Decl., Ex. H, Writ of Mandamus, *Zignego v. Wisconsin Elections Commission*, Case No. 2019CV000449 (Ozaukee County Circuit Court, Branch 1), *on appeal*, Case No. 2019XX2120 (Wisconsin Court of Appeals, District IV) ("Therefore, Defendant Wisconsin Election Commission is hereby ordered to comply with the provisions of § 6.50(3) and deactivate the registrations of those electors who have failed to apply for continuation of their registration within 30 days of the date the notice was mailed under that provision.").

27.     234,039 registered Wisconsin voters comprise seven percent of the state's 3,304,914 registered voters.  Poland Decl., Ex. I, Wisconsin Elections Commission, VOTER REGISTRATION STATISTICS (Dec. 2019), https://elections.wi.gov/node/6638.

28.     As a result of this order, the Commission's policy of waiting 12 to 24 months before deactivating a voter has effectively been invalidated.  *See* Poland Decl., Ex. B, Jun. 11, 2019 WEC Memorandum, at 3-5.

29.     At the December 13 hearing, counsel for the defendants in that action (who are also counsel for the same Defendants here (hereinafter, "Defendants' counsel")) stated: "[The ERIC letter] does not provide any notice of deactivation, in thirty days or otherwise . . . this would change the status quo, deactivate registered electors without any notice."  Poland Decl., Ex. G, Hr'g Tr., at 58:23–59:2.

30.     Defendants' Counsel further explained that:

> [The Commissioners] weren't planning to deactivate these – these voters . . . Under the ERIC mover agreement, they have to reach out to voters and let them know that there was – there's been some indication that they might have moved . . . [T]hat's all that this notice was doing. It was not saying in thirty days you're gonna be deactivated, it wasn't saying at some point you're gonna be deactivated, it was saying here are the steps you can take to . . . update the voter rolls, help us update the voter rolls.

Poland Decl., Ex. G, Hr'g Tr. at 60:4-17; *see also id.* at 58:22–59:2 ("That is a complete change of the status quo . . . because the 2019 mailing . . . was a new process, it – it does not provide any notice of deactivation or otherwise . . . so the . . . this would – this would change the status quo, deactivate registered electors without any notice.").

31.    Defendants' Counsel also estimated that some 14,000 voters may have been erroneously included on the 2019 ERIC list.  Poland Decl., Ex. G, Hr'g Tr. at 56:2–6.  *Id.* at 58:14–9:2.

32.    These state court-ordered changes in the Commission's rules and procedures come on the eve of a spring primary election and a special primary election for the U.S. Congressional District 7 seat, both to be held on February 18, 2020.  Poland Decl., Ex. J, Wisconsin Elections Commission,     Calendar     of     Election     Events,     *available     at* https://elections.wi.gov/sites/elections.wi.gov/files/2019-11/2020%20Calendar%20of%20Election%20Events%20PDF%20%28rev%202019-11%29.pdf.

33.    Defendants' Counsel also moved for a stay, arguing that a mandamus order so close to the elections would negatively impact the efficiency of these elections' administration: "If the Commission's duty is for . . . efficiency of election administration, . . . this would create chaos, to do this now."  Poland Decl., Ex. G, Hr'g Tr., at 77:13–15.  Counsel noted that Municipal clerks must mail out absentee ballots by 21 days before the state spring primary election on January 28, 2020, and on January 2, 2020 for the Congressional District special primary.  Poland Decl., Ex. G, Hr'g Tr. at 77:7–12.

34.     Plaintiff League moved to intervene as a defendant in the Ozaukee County action. In its brief in support of its motion to intervene the League argued that "burdening voters with the need to re-register per se violates the First and Fourteenth Amendments to the U.S. Constitution when their removal was erroneous and unlawful," and that "[i]f denied intervention here, the League may well be compelled to bring affirmative litigation *against the current Defendants* to prevent or redress the unlawful removal of registered voters."   Poland Decl., Ex. K, Proposed Intervenor-Defendant's Brief in Support of Motion to Intervene, at 4, 19 (emphasis in original). At the December 13, 2019 oral argument on the League's motion to intervene, the League's counsel reiterated the League's federal constitutional due process claims, arguing that the 2019 mailing is "deficient" and "violates constitutional requirements of due process," which counsel further argued "would require a new notice to be mailed out before any removal from the rolls." Poland Decl., Ex. G, Hr'g Tr. at 25:16–21.

35.     The Circuit Court judge noted the League's arguments that the 2019 Mailing violates the U.S. Constitution, stating in his ruling on the League's motion to intervene that the League "talk[s] in terms of due process violations and constitutional issues . . . They are talking a much more complex, much more involved litigation than what I am looking at and what has been brought by the plaintiffs."   Poland Decl., Ex. G, Hr'g Tr. at 30:21–31:1.   The Circuit Court judge continued: "[I]f the League were this concerned about it, they should have done this on their own, in a separate lawsuit, and this is not the lawsuit to do it," *id.* at 35:7–9, denying the League's motion to intervene, and further suggesting "[i]f they want to file an action that would have the normal discovery provisions and the discovery process and motions and witness lists and things like that, that is what they should do."   *Id.* at 33:15–18.   After denying the League's motion to

intervene, the Circuit Court issued a bench ruling granting the plaintiffs' petition for a writ of mandamus and ordered the immediate cancellation of the 2019 ERIC list voters' registrations.

36.     As of this filing, Defendants' counsel have appealed the *Zignego* order granting mandamus and requested a stay.  The Court of Appeals declined to issue a stay on an *ex parte* basis and instead has ordered briefing due by Monday, December 23, 2019.  Poland Decl., Ex. L, Order, *Zignego v. Wisconsin Elections Commission*, Case No. 2019XX2120 (Wisconsin Court of Appeals, District IV).

37.     Today, the *Zignego* plaintiffs have filed a Petition to Bypass with the Wisconsin Supreme Court.  Poland Decl., Ex. M, Petition to Bypass, *Zignego v. Wisconsin Elections Commission*, Case No. 2019XX2120 (Wisconsin Supreme Court) (Dec. 20, 2019).  Later today, the Wisconsin Supreme Court issued an order directing Defendants' counsel to file a response by no later than January 3, 2020.  Poland Decl., Ex. N, Order, *Zignego v. Wisconsin Elections Commission*, Case No. 2019XX2120 (Wisconsin Supreme Court) (Dec. 20, 2019).

38.     Defendant Commission Chairman Dean Knudson has stated that already about half a percentage point of the 234,039 voters on the 2019 ERIC list or 1,170 voters have communicated to say they were "false positive match[es]"—that they have not in fact moved.  Poland Decl., Ex. O, Transcript of PBS Wisconsin, Here and Now, *WILL Sues State Elections Agency Over Voter Roll Maintenance* (Dec. 6, 2019), at 4:35, *available at* https://pbswisconsin.org/wpt-video/here-and-now/will-sues-state-elections-agency-over-voter-roll-maintenance/.

39.     Two weeks later, the most up-to-date statistics available on the Wisconsin Elections Commission's website reflect that that number has more than doubled to 2,412 voters who have requested continuation at their current address and were, therefore, erroneously flagged by ERIC

as movers.  Poland Decl., Ex. P, Wisconsin Elections Commission, Updated movers mailing information (Dec. 20, 2019), https://elections.wi.gov/node/6649.

40.     Defendants have offered no evidence that they have ensured that the 2019 ERIC list is far more accurate than the 2017 ERIC list, with its 7.78 percent error rate, or that they are better able to differentiate between true residential address changes and false positives.  Poland Decl., Exs. A, B, C, D, WEC Memoranda from March, June, September, and December 2019.

41.     Wisconsin voter registration data can be requested, purchased, and downloaded via the BADGER Voters website (https://BADGERVoters.wi.gov).  Poland Decl., Ex. Q, *WisVote Voter Data Requests / Voter List Requests*, WIS. ELECTIONS COMM'N, https://elections.wi.gov/clerks/svrs/voter-data.

42.     Before he was appointed to the Wisconsin Elections Commission, Defendant Commissioner Robert F. Spindell, Jr. met with the *Zignego* plaintiffs' counsel and encouraged them to bring the suit.  Poland Decl., Ex. R, Wisconsin Elections Commission Meeting Video, 3:35:34—3:36:23 (Dec. 2, 2019), *available at* https://wiseye.org/2019/12/02/wisconsin-elections-commission-december-2019-meeting/.

43.     Plaintiff Patricia Ann Villarreal is an eligible and registered Wisconsin voter and a member of the League.  She is a United States citizen, 64 years old, and has never been convicted of a felony.  She also has never had a court take away my right to vote.  She has lived at the same address in the City of Milwaukee, Wisconsin since June of 2003.  She consistently votes in federal, state, and local elections.  In roughly the second week of November of this year, she received the 2019 ERIC letter in the mail.  It was sent to her current address, and the tear-off postcard at the bottom included this exact same address.  The Milwaukee election office's information appeared at the top and bottom of the letter.  She was surprised, then puzzled, and finally, suspicious of the

letter.  She thought it might be a scam, tore up the letter, and took no action.  She had just voted in the last election and saw her name in the pollbook.  She thought the letter was voter intimidation and that someone was trying to intimidate her.  Declaration of Patricia Ann Villarreal ("Villarreal Decl.") ¶¶ 1–7.

44.    Plaintiff Sasha Albrecht is an eligible and registered Wisconsin voter residing in Milwaukee, Wisconsin.  She is 29 years old, a United States citizen, and has never been convicted of a felony.  She has never had a court take away her right to vote.  On July 31st of this year, she moved to a new residence in the City of Milwaukee, three blocks away from her prior residence. She did not move to a new municipality.  She planned to update or confirm my voter registration address at the polls during the next election in which she voted.  She did not think that moving within the same city would cause her voter registration to be cancelled or that she would need to re-register.  This fall, she received a copy of the 2019 ERIC letter in the mail.  She read the letter and understood its suggestions for updating or confirming her voter registration.  But she did not understand the letter to mean that she could be removed from the rolls if she did not update or confirm my registration address.  She did not expect that taking no action would result in her removal from the voter rolls.  She did not think she needed to do anything in response to the letter to maintain her status as a registered voter and still planned to update her voter registration address at the polls on Election Day.  She discarded the ERIC letter.  Declaration of Sasha Albrecht ("Albrecht Decl.") ¶¶ 1-6.

45.    Plaintiff League of Women Voters of Wisconsin ("the League" or "LWVWI") will have to redouble its voter registration efforts if 234,039 registered Wisconsin voters are removed from the rolls.  In 2018, a general election year, it spent over $12,000 and 6,500 volunteer hours conducting outreach and helping approximately 12,582 voters register to vote or update their

registration.  Declaration of Erin Grunze ("Grunze Decl.") ¶¶ 5–6.  Plaintiff League, which brings its claims on behalf of its individual members and itself, also stands to be harmed by the 2019 ERIC letter's assurances that voters could confirm their addresses by voting in the next election. The League will be compelled to divert time, resources, and money to re-register voters who have not in fact moved from the residential address listed on the 2019 ERIC letter mailed to them, and who are forced off the rolls.  Grunze Decl. ¶¶ 13-18.  LWVWI devotes a substantial part of its year-round work to assisting voters to register in furtherance of its mission to maximize eligible voter participation through its voter registration efforts and encourage civic engagement and to defend the rights of eligible Wisconsin voters.  Grunze Decl. ¶¶ 13-18.  The deactivation of these voters, including erroneous deactivations, will directly burden and undermine the League's dual interests in registering voters and ensuring they stay registered and can vote.  Grunze Decl. ¶¶ 13-18.  It will force LWVWI and the local Leagues to divert their time, money, and other resources to educating and *re-registering* thousands of voters in the 2020 election cycle.  Grunze Decl. ¶¶ 13-18.  Past errors with the ERIC list data show that these deactivations of registered voters based on the ERIC lists will inevitably add to LWVWI's work by requiring the organization to expend time, money, and other resources assisting voters who were who were removed in error to re-register.  Grunze Decl. ¶ 14.

46.    Errors in the 2017-2018 ERIC list required LWVWI to take steps to protect its members and voters. Among other actions, it advocated for deactivated voters at Commission meetings; urged the commissioners and municipal clerks to identify erroneously-removed voters and reactivate their registrations; trained volunteers for its Election Observation Program to document implementation of the Commission's supplemental ERIC poll list of erroneously-deactivated voters during the 2018 spring election; issued findings and recommendations regarding

the use of the supplemental list in our May 2018 Election Observation Program Report; and disseminated information to local Leagues about deactivations and the supplemental poll list. LWVWI estimates that it spent approximately $4,500 on these activities. Grunze Decl. ¶ 15.

47.     Local Leagues also took action to prevent or mitigate the harms caused to voters as a result of errors in the 2017-2018 ERIC list. For example, the League of Women Voters of Milwaukee County spoke at a press conference held by the city's Mayor and Director of the City Election Commission; and communicated with members and the public about the deactivations and encouraged voters to check their registration status. Grunze Decl. ¶ 16.

48.     As a result of the errors in 2017-2018 ERIC list, LWVWI has worked to be proactive with respect to the 2019 ERIC list maintenance process. It posted the 2019 ERIC letter to its Facebook page, shared information about the process with local Leagues and partners, and gave an interview to a reporter at Reuters. However, because the state court litigation has significantly shortened the timeline for conducting the 2019 ERIC maintenance process, LWVWI believes these efforts to educate voters about the process and to prevent erroneous deactivations will be insufficient and less effective. Requiring the state to postpone the removal of voters until it has provided them with clear notice and instructions would allow LWVWI additional time to help voters confirm or update their registrations, greatly reduce the number of erroneous deprivations, and protect the accuracy of the rolls. Grunze Decl. ¶ 17.

49.     In light of the state court order requiring the immediate removal of 2019 ERIC list voters, LWVWI intends to step up its outreach to voters and its efforts to prevent wrongful deactivations and, if the purge occurs, re-register as many of these voters as possible before the upcoming elections in February 2020. In the week since the state court's decision, it has issued

public statements to inform the public about the court's ruling and encouraging voters to check their registration status.  Grunze Decl. ¶ 18.

## ARGUMENT

### A.  Legal Standard for Preliminary Injunction

Plaintiffs seeking preliminary injunctive relief must demonstrate: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); *Michigan v. U.S. Army Corps of Engineers,* 667 F.3d 675, 679 (7th Cir. 2011).  In proving that the equities weigh in its favor, a party seeking a preliminary injunction also must show that "traditional legal remedies would be inadequate" and that in the balancing of equities, a court seeks to minimize the cost of potential error and "balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.'"  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (quoting *Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1433 (7th Cir. 1986)). This framework serves the underlying purpose of a preliminary injunction: "to preserve the relative positions of the parties until a trial on the merits can be held."  *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (quoting *Univ. of Tex. v. Camenish*, 451 U.S. 390, 395 (1981)).

### B.  Plaintiffs satisfy the requirements for preliminary injunctive relief.

#### 1.  Likelihood of Success On the Merits

With respect to the first *Winter* factor, "the most significant difference between the preliminary injunction phase and the merits phase is that plaintiff in the former position needs only

to show a 'likelihood of success on the merits rather than actual success.'" *Michigan v. Army Corps of Engineers*, 667 F.3d at 781. This is consistent with the "often-repeated rule that the threshold for establishing likelihood of success is low." *Id.*; *Hoosier Energy Rural Elec. Co-op. Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 721 (7th Cir. 2009) (likelihood of success only requires "plausible claim on the merits").

### a.   Count One: Procedural Due Process Violation

The deficiencies in the Wisconsin Elections Commission's 2019 ERIC letters present a textbook example of a procedural due process violation. The Due Process Clause of the Fourteenth Amendment prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. At a minimum, "[t]o meet the requirements of due process, the state must afford notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Morrell v. Mock*, 270 F.3d 1090, 1095 (7th Cir. 2001) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Courts tasked with reviewing procedural due process claims face two questions: "(1) is there a property or liberty interest protected by due process; and (2) if so, what process is due, and when must that process be made available?" *Simpson v. Brown Cty.*, 860 F.3d 1001, 1006 (7th Cir. 2017). Answering these questions requires balancing three interests: "first, the private interest at stake; second, the risk of erroneous deprivation and the value, if any, of additional procedural safeguards; and third, the government's countervailing interests." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). The Seventh Circuit has held that due process requires pre-deprivation procedures except in cases of emergencies or when the government conduct at issue is "random and unauthorized." *Id.* at 1010. Thus, the fact that Wisconsin law offers erroneously-removed voters the opportunity to re-register at the polls does not cure Defendants' due process violations.

Plaintiffs have clearly established a likelihood of success on the merits of their two due process claims. *First*, Wisconsin law creates a statutory entitlement in voter registration, by guaranteeing the right to register and cast a ballot to every U.S. citizen above the age of 18 who is a resident of the state and who registers to vote in accordance with the procedures established under state law and regulations. Wis. Stat. § 6.27 ("Each elector shall register under this chapter before voting in any election . . . ."); *see also id*. § 6.29 ("No names may be added to a registration list for any election after the close of registration, except as authorized under this section or s. 6.55(2) or 6.86(3)(a)2. Any person whose name is not on the registration list but who is otherwise a qualified elector is *entitled to vote at the election upon compliance with this section*, if the person complies with all other requirements for voting at the polling place.") (emphasis added). Eligible, registered voters also enjoy an "individual and personal" right to vote under Wisconsin law. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). That statutory entitlement embraces the right to *remain* continuously registered until deactivation is triggered by, among other things, death, felon disenfranchisement, or a move to another municipality. Wis. Stat. §§ 6.50(4); 6.03(1)(b); 6.50(3). Wisconsin law also entitles any registered voter to cast ballots in any way the voter qualifies to vote. As an example, all registered Wisconsin voters are entitled to vote by mail-in absentee ballot, if the voter files a request by the deadline mandated in state law. Wis. Stat. § 6.20.

*Second*, the 2019 ERIC letter fails to give adequate notice and thereby creates an unacceptable risk of erroneous deprivation of a statutory entitlement. Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Garcia v. Meza*, 235 F.3d 287, 291 (7th Cir. 2000) ("[W]e

believe the correct approach is a fact-specific analysis under the due process standard set forth by the Supreme Court in *Mullane*, which requires us to consider all the circumstances of each case to determine whether the notice provided is reasonably calculated to apprise the claimant of the impending proceeding.").  For example, in *Knutson v. Village of Lakemoor*, the Seventh Circuit upheld traffic citations sent to plaintiffs in the mail because "each notice provide[d] detailed information about the procedures for contesting the violation, the date by which the fine must be paid or the violation contested, and a full list of possible defenses . . ."  932 F.3d 572*, 578 (7th Cir. 2019); *see also Clancy v. Off. of Foreign Assets Control of U.S. Dept. of Treasury*, 559 F.3d 595, 598–99 (7th Cir. 2009) (upholding notice that "provided the various laws and regulations that governed [the defendant's] actions and informed him that he could be assessed a civil penalty of $250,000 for each violation" and which "informed [the defendant] that he had thirty days to make a written presentation to OFAC responding to the allegations . . ."); *Chicago Cable Commc'ns v. Chicago Cable Comm'n*, 879 F.2d 1540, 1546 (7th Cir. 1989) (finding notice sufficient because it "directed that each of the three CCTV franchisees, within fifteen days of receipt of the notice, either respond in writing to the Commission contesting the notice of violation with supporting documentation to show otherwise and requesting an opportunity to be heard, or remedy the particular violation"); *Garcia-Rubiera v. Fortuno*, 727 F.3d 102, 111 (1st Cir. 2013) ("That statement of what the notices certainly need include did not preclude Plaintiffs from establishing that other information was also necessary in order to render the notices effective in providing a meaningful opportunity to comply with the reimbursement requirements.").

Here, the 2019 ERIC letter created a risk of erroneous deprivation by failing to meet the bare minimum requirements for notice.  "Everything the [recipients] needed to know to contest" their deactivations was not "fully and clearly explained."  *Knutson*, 932 F.3d at 578.  Recipients

of the 2019 ERIC letter were presented with a list of actions they could take to update or confirm their registrations, and then a detachable confirmation postcard that read: "I, [voter's name], certify I still live at [voter's address] and want to keep my voter registration active in Wisconsin." Poland Decl., Ex. D, *September 24, 2019 WEC Agenda Documents*, 2019 ERIC Letter, at 53. It did not explain to voters that a failure to respond or take one of the enumerated actions would result in their removal from the voter rolls; nor did it explain the meaning of "active" status. "Active" is a legal term of art and does not adequately inform voters that they will be removed from the rolls if they fail to take one of the specified actions in response to the letter. *See Ramirez v. Young*, 906 F.3d 530, 536–37 (7th Cir. 2018) (explaining that notice "is ineffective if it is delivered in a language that is incomprehensible to the recipient"). Indeed, many states allow "inactive" voters to continue voting, without re-registering, if they appear at the polls. *See, e.g.*, Ill. Admin. Code. tit. 26 § 216.20 (defining "inactive voter" as "a person who, having once submitted a Voter Registration Application subsequently acknowledged by the election authority having jurisdiction over the voter's place of residence, or a registration card, has not responded to a notice to confirm his or her address, *but whose authority to vote has not yet been canceled*") (emphasis added); Fla. Stat. Ann. § 98.065 ("A voter on the inactive list may be restored to the active list of voters upon the voter updating his or her registration, requesting a vote-by-mail ballot, or appearing to vote."); 4 Pa. Code § 183.11(f)(3) ("A commission shall allow an inactive voter to vote, sign petitions, and have the other privileges of a registered voter."); Cal. Elec. Code § 2226 (inactive voters returned to active status if they vote between the date of the mailing required by state law and two federal general elections after the mailing date, and canceled if they do not).

The 2019 ERIC letter also did not provide a deadline to respond, or clearly define which election on the Commission's 2020 elections calendar was "the next election" at which recipients

could confirm their addresses, thus leaving that option open to multiple, reasonable interpretations. *Cf. United States v. Adkins*, 743 F.3d 176, 193 (7th Cir. 2014) ("[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).  For example, a voter might have reasonably construed this option as permitting them to confirm their address in the next election in which they chose to participate, rather than the February 18, 2020 spring primary.

By contrast, the 2017 ERIC letter explained that a voter would be deactivated within 30 days of the mailing and that the voter would need to re-register if they took no action: "If you do not register at your new address at this time and do not return the continuation card within 30 days, you will need to re-register before you are able to vote."  Poland Decl., Ex. E, Attachment to Wisconsin Elections Commission Memorandum, *ERIC List Maintenance Mailing to Voters Who Have Moved, ERIC Postcard Sample In-State Movers* (Oct. 29, 2017).

The risk of erroneous deprivation is magnified by the documented error rate in the ERIC lists provided to Wisconsin, including the 2019 ERIC list.  In 2017, the ERIC list indicated that 282,448 registered voters had moved within the state.  Poland Decl., Ex. A, Mar. 11, 2019 Commission Memorandum, at 3.  Of these voters, 6,153 had not moved and confirmed their addresses.  *Id*.  Another 12,133 had their registrations reactivated by the Commission.  *Id*. at 4.  A further 5,984 voters used the Supplemental Movers Poll List to confirm their registration addresses at the polls throughout elections from April to November of 2018.  *Id*.  After raising concerns about the reliability of the 2017–2018 ERIC list, clerks or commissions in three municipalities, including the City of Milwaukee, reactivated a total of 38,430 voters, 6.87 percent of whom or

2,357 voted at the addresses listed on their registrations.  *Id*. at 5.  All told, this reflected an error rate of at least 7.78 percent of the 341,855 voters on the 2017–2018 ERIC list.

With respect to the 2019 ERIC list, Defendant Commission Chairman Dean Knudson has stated that already about half a percentage point of the 234,039 voters on the 2019 ERIC list or 1,170 voters have communicated to say they were "false positive match[es]"—that they have not in fact moved.  Poland Decl., Ex. O, Transcript of PBS Wisconsin, Here and Now, *WILL Sues State Elections Agency Over Voter Roll Maintenance* (Dec. 6, 2019), at 4:35, *available at* https://pbswisconsin.org/wpt-video/here-and-now/will-sues-state-elections-agency-over-voter-roll-maintenance/.  Just two weeks later, the most up-to-date statistics available on the Wisconsin Elections Commission's website reflect that that number has more than doubled to 2,412 voters who have requested continuation at their current address and were, therefore, erroneously flagged by ERIC as movers.  Poland Decl., Ex. P, Wisconsin Elections Commission, Updated movers mailing information (Dec. 20, 2019), https://elections.wi.gov/node/6649.  By the admission of Defendants' own counsel, the 2019 ERIC letter failed to provide adequate notice: "[B]ecause the 2019 mailing . . . was a new process, it – it does not provide any notice of deactivation or otherwise . . . so the . . . this would – this would change the status quo, deactivate registered electors without any notice."  Poland Decl., Ex. G, Hr'g Tr. at 58:22–59:2.  The letter did not adequately explain to voters the consequences of failing to respond or otherwise take one of the enumerated actions; nor did it provide a deadline for responding or taking one of the enumerated actions, because it was not intended for this purpose.  It was meant merely to "help" election officials update the rolls or confirm their accuracy, and did not communicate that their registration could be deactivated.  Poland Decl., Ex. G, Hr'g Tr. at 60:15–17.  Counsel also argued that the status quo would be best served by not removing voters from the rolls at this time.  Poland Decl., Ex. G, Hr'g Tr. at 58:12–

59:2. By the Defendants' own admission, then, converting the ERIC letter from a request for help to a legally significant communication risks erroneous deprivation, especially for the 14,000 voters who Defendants conceded may have been mistakenly included on the mailing list. *See id.* at 56:2–6.

Plaintiff Patricia Ann Villarreal is one such voter. She has lived at the residence associated with her voter registration for over sixteen years and should therefore have never appeared on the ERIC list. Villarreal Decl. ¶ 2. In fact, it is her erroneous inclusion on the list that led her to doubt the legitimacy of the ERIC letter and to discard it, believing it had been sent by a non-governmental entity to intimidate her and discourage her from voting. *Id.* ¶¶ 5–6. Even had she accepted it as a legitimate government communication, it did not tell her that her registration would be cancelled for failing to respond. *Id.* ¶ 4. Because Plaintiff Villarreal destroyed the letter, believing it was fake, *id.* ¶ 5, she implicitly opted to confirm her address at the polls.

The Commission's wholly inadequate provision of notice has increased the likelihood that voters have not taken and will not take the steps needed to confirm their addresses and, in turn, increased the likelihood that their registrations will be cancelled. Further, this lack of adequate notice has increased the likelihood that they will be denied their right to vote because they are unaware their registrations have been cancelled and have been led to believe they can vote in person without re-registering and without the documentary proof of residence needed to re-register. Lastly, this lack of adequate notice also increased the likelihood that voters will be unable to vote in the manner to which they are entitled under state law.[1]

---

[1] For instance, many on the ERIC list who are ultimately deactivated are at risk of being deprived of their right to cast an absentee ballot, as many voters will probably not learn their registrations have been cancelled until filing the request to vote absentee; for people with physical disabilities, if they miss the deadline to re-register online, they may not be able to cast a ballot at all or their right to vote will be severely burdened.

That voters could confirm their registration online or by returning the postcard, but chose to confirm at the polls, is of no moment. The mailing represented that they could confirm online, by returning the detachable postcard, *or* by voting in the "next election."  Having granted voters this option and having induced them to forgo the others, the government must permit these voters to confirm their registration addresses at the polls.  *Cf. Paulson v. Olson Implement Co., Inc.*, 107 Wis. 2d 510, 517 n.6, 319 N.W. 2d 855 (Wis. 1982) ("A contract is considered unilateral where only one party has made a promise and only that party is subject to a legal obligation.  This is typified by the law school hypothetical situation where A says to B, 'If you walk across Brooklyn Bridge, I promise to pay you ten dollars.' A has made a unilateral contract which arises when— and if—B performs the act."); *Lazarus v. Am. Motors Co.*, 21 Wis.2d 76, 83, 123 N.W.2d 548 (Wis. 1963) ("A unilateral contract will be legally enforceable when it has induced substantial performance or when it has brought about a change of position on the part of the offeree.").

Plaintiff Albrecht had decided to avail herself of this option after receiving the ERIC letter. Albrecht Decl. ¶ 4.  She moved to a new residence located three blocks from the residence associated with her voter registration earlier this year. *Id.* ¶ 2.  Plaintiff Albrecht understood the letter to say that she could update her registration at the polls, although it did not provide a date by which she needed to complete this action or inform her that her registration would be cancelled if she did not take any action.  *Id.* ¶ 4.  Wisconsin law also permits voters to update their addresses— without ever cancelling their registrations—at their polling place on Election Day.  *See* Wis. Stat. § 6.55(a).  As a result, the 2019 ERIC letter failed entirely to put Plaintiff Albrecht on notice that she needed to respond to the letter or that failure to do so would result in her registration's deactivation.  It led her to believe that she could update her registration address at the polls, consistent with the letter's instructions and Wisconsin law.

Plaintiff League will also have to redouble its voter registration efforts due to these due process violations.  In 2018, a general election year, it spent over $12,000 and 6,500 volunteer hours conducting outreach and helping approximately 12,582 voters register to vote or update their registration.  Declaration of Erin Grunze ("Grunze Decl.") ¶¶ 5–6.  Defendants have offered no evidence that they have taken steps to ensure that the 2019 ERIC list does not have the same error rate as the 2017 ERIC list (7.78 percent).  Defendants have offered no evidence that they have ensured that the 2019 ERIC list is far more accurate than the 2017 ERIC list, with its 7.78 percent error rate, or that they are better able to differentiate between true residential address changes and false positives.  Poland Decl., Exs. A, B, C, D, WEC Memoranda from March, June, September, and December 2019.  As a result, the League will have to work to re-register approximately 18,000 voters in the eight weeks before the February 18, 2020 election—or 1.4 times the number of voters it registered across twelve months in 2018.  Even the estimate offered by Defendants' counsel (14,000 erroneously included voters) requires the Plaintiff League to potentially assist 1,500 more voters than it did during the last general election cycle.  Poland Decl., Ex. G, Hr'g Tr. at 56:2–6; Grunze Decl. ¶¶ 17–18.

*Third*, the government cannot assert any countervailing interest that outweighs the risk of erroneous deprivation.  In assessing governmental defendants' interests, courts also consider "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Riano v. McDonald*, 833 F.3d 830, 834 (7th Cir. 2016) (quoting *Mann v. Vogel*, 707 F.3d 872, 879 (7th Cir. 2013)).  Although Defendants do have an interest in conforming their conduct to state law, they have an equally weighty interest in complying with the federal Constitution.  Moving forward with the removal process would also increase the burden on Defendants and county election officials, while enjoining the process would

27

maintain the status quo.  There are now less than two months before the spring primary and U.S. Congressional District 7 special primary election on February 18, 2020.  Poland Decl., Ex. J, Wisconsin Elections Commission Calendar of Election Events.  Absentee ballots for these two races will be sent out on January 28 and January 2, respectively.  *Id*.  There are also elections scheduled in April, August, and the highly anticipated 2020 federal elections in November.  *Id*. Carrying out the immediate removal of over 234,000 voters would require Defendants and their agents to balance preparing ballots and polling places, recruiting poll workers, and other critical election activities with removing and re-registering voters.  The prospect of having to re-register voters at the polls will increase the potential for long lines and congested polling places, thereby creating more work for the Defendants and their agents.  In instances where voters cannot cast a ballot as a result of their erroneous removal, Defendants and their agents will be unable to carry out one of their principal missions: to facilitate the registration of eligible electors so that they can exercise their constitutionally protected right to vote.  And finally, if the purpose of the underlying state statute that the state court has construed as requiring immediate removal is to ensure accurate voter rolls, then the 2019 ERIC letter, the ERIC list's suspected error rate, and its hasty application hardly meet this goal.

For the foregoing reasons, Plaintiffs are likely to succeed on the merits of their procedural due process claim.

### b.   *Count Two: Due Process Violation Based Upon Detrimental Reliance of Voters Who Have Not Moved*

Plaintiffs are also likely to succeed on the merits of their due process claim based on voters' detrimental reliance.  Registered Wisconsin voters who have not moved and who received a 2019 ERIC letter were informed by the Commission that they could confirm their voter registration address identified on the ERIC notice letter by simply voting in "the next election", without

bringing proof of residence to the polls and re-registering in the next election. A reasonable voter would have read this phrase to mean that they could confirm their registration address in the next election in which they cast a ballot, since the letter did not specify any particular election. Absent a new letter that provides adequate notice, these voters who are on the immediate purge list will detrimentally rely on the Commission's representation that they need not re-register at the polls.

Changing rules upon which voters rely to their detriment indisputably violates the Due Process Clause of the Fourteenth Amendment. The law is clear that rules must be communicated to voters and not changed such that a voter who followed the first set of rules would not have their right to vote denied or burdened under the second set. In *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), state officials had induced a class of voters to cast absentee ballots in a primary election. The First Circuit held that the voters' ballots could not be subsequently invalidated under state law because the Constitution's due process guarantee forbade denying the right to vote to those voters who had detrimentally relied on state officials' representations. *Id.* at 1075–76. When "an officially-sponsored election procedure" is "in its basic aspect . . . flawed" and unfair, it violates due process. *Griffin*, 570 F.2d at 1078. In fact, the *Griffin* court relied on precedent from the Seventh Circuit, *Briscoe v. Kusper*, 435 F.2d 1046 (7th Cir. 1970). *Briscoe* found a due process violation, noting the changing of rules mid-election, the failure to convey those changes adequately, and detrimental reliance by candidates and voters:

> In *Briscoe v. Kusper*, 435 F.2d 1046 (7th Cir. 1970), the case relied on in large part by plaintiffs and the district court here, certain nomination papers in a Chicago aldermanic election were invalidated by the Board of Election Commissioners of the City of Chicago for technical failings. Those failings had become such only because the Board had recently changed its requirements for nominating petitions as they concerned duplicated signatures and the necessity for a middle initial in the signatures affixed to the petitions. Plaintiffs, signatories and would-be candidates, had compiled their petitions on the basis of the old rules, the Board having failed effectively to announce the new. The court found the Board's refusal to accept the now-invalid petitions to be constitutionally unacceptable. Due process was held to require the Commissioners to "establish and publish meaningful guidelines"

for the nomination of candidates. The unannounced eleventh-hour change of policy could not be used to deprive candidates and voters the right of participating in the aldermanic election.

*Griffin*, 570 F.2d at 1078 (citing *Briscoe*, 435 F.2d 1046, 1054–56 (7th Cir. 1970)) (emphasis added). *Briscoe* involved the rejection of signatures on a "technical failing," *i.e.* the omission of middle initials from petition signatures, and official failure to communicate an "eleventh-hour change of policy." *Id.* This case is on all fours with the instant situation, compelling a finding that the state court-ordered immediate purge of registered Wisconsin voters—who have relied to their detriment on the Commission's representation that they may simply vote without re-registering in "the next election" in order to confirm the registration address on the ERIC notice letter—violates the Constitution. *See also Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90, 94-96 (N.D.N.Y. 2006) (holding that voters who should have been required to reapply to receive absentee ballots under state law reasonably relied on election officials' erroneous issuance of absentee ballots and suffered a deprivation of their due process rights when election officials subsequently refused to count their votes); *Williams v. Sclafani*, 444 F. Supp. 906, 911–13 (S.D.N.Y. 1978) (holding that New York City council candidate's detrimental reliance on erroneous Board of Elections guidance that candidate petition signatures could be gathered simultaneously from new registrants could not be used to invalidate his candidacy). This rule is analogous to the principle of promissory estoppel in contracts law. *Cf. Emirat AG v. High Point Printing LLC*, 248 F. Supp. 3d 911, 937 (E.D. Wis. 2017) (citing *Major Mat Co. v. Monsanto Co.*, 969 F.2d 579, 582 (7th Cir. 1992)) (under Wisconsin law, promissory estoppel is warranted when "(1) the defendant made a promise that he should reasonably have expected to induce action or forbearance by the plaintiff, (2) the promise did induce action or forbearance by the plaintiff, and (3) injustice can be avoided only by enforcement of the promise").

Simply put, if the *Zignego v. Wisconsin Elections Commission* mandamus order stands, then Defendants will have changed the rules and procedures regarding voter registration in Wisconsin elections.  Having induced reliance on the first set of rules, they have now changed them pursuant to a state court's order and will deprive duly-registered Wisconsin voters of their voter registration status.  Removing voters from the rolls before they can avail themselves of an option the Commission represented would be available constitutes an unconstitutional about-face in the state's election rules and procedures, in violation of the Due Process Clause.  *Griffin*, 570 F.2d at 1078.

To add to the confusion created by this last-minute change to the rules, the Commission failed in its letter to specify which election on the Commission's 2020 calendar constituted "the next election" for the purposes of confirming a voter's registration address—that is, whether this was the next election that occurred or the next election in which the voter cast a ballot.  Absent a specific date, a reasonable voter would have understood "the next election" to mean the next election in which they voted, and would detrimentally rely on this understanding when seeking to confirm their address.

Further, Plaintiff LWVWI, which brings its claims on behalf of its individual members and itself, also stands to be personally harmed by the 2019 ERIC letter's assurances that voters could confirm their addresses by voting in the next election.  This last-minute change in election rules will cause people to lose their registration status and force LWVWI to divert time, resources, and money to re-register voters who have not in fact moved from the residential address listed on the 2019 ERIC letter mailed to them, and who are forced off the rolls due to Defendants' changes in the voter registration rules and changes in their representations as to those rules.  Grunze Decl. ¶¶ 13-18.

Plaintiffs have therefore also shown that they are likely to succeed on the merits of their detrimental reliance due process claim.

## 2. Likelihood of Irreparable Harm

Regarding the second element of irreparable harm, Plaintiffs allege the deprivation of their right to stay registered to vote under Wisconsin law. Voter registration is a prerequisite to voting, and a statutory entitlement created by Wisconsin law for those who follow the mandated procedures and satisfy the requirements in the Election Code. Wis. Stat. § 6.27 ("Each elector shall register under this chapter before voting in any election . . . ."). Voting and the prerequisite of voter registration are also safeguarded by the Constitution. The Supreme Court has long held that, as a means for citizens to associate with political parties, ideas and causes, voting is protected by the First Amendment. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000); *Norman v. Reed*, 502 U.S. 279, 288– 90 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 787–89, 806 (1983); *Kusper v. Pontikes*, 414 U.S. 51, 56–58 (1973); *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968). The First Amendment also protects voting as a form of expressive conduct, just as it protects expressions of support for candidates, parties, and causes, regardless of the format or medium. *City of Ladue v. Gilleo*, 512 U.S. 43, 54–59 (1994) (political yard signs); *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (describing ballot access restrictions as "impair[ing] the voters' ability to express their political preferences"); *Buckley v. Valeo*, 424 U.S. 1, 48 (1976) (advocacy for election or defeat of candidates). Because registration is a prerequisite to and/or enables voting in primary and general elections, it too is protected by the First Amendment. *See Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 400 (2000) (Breyer, J., concurring) ("[A] decision to contribute money to a campaign is a matter of First Amendment

concern—not because money *is* speech (it is not); but because it *enables* speech.") (emphasis in original).

Moreover, the First and Fourteenth Amendments also protect voter registration activities like those in which the League engages.  "'[E]ncouraging others to register to vote' is 'pure speech,' and, because that speech is political in nature, it is a 'core First Amendment activity.'" *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (citing *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012)).  And organization in support of voter registration also involves political association that is, itself, protected under the First Amendment.  *See Hargett*, 400 F. Supp. 3d at 720 (citing *Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989) ("Where groups, formal or informal, seek to advance their goals through the electoral process, regulations preventing their members from participating in voter registration impair their ability effectively to organize and make their voices heard.") (citation and punctuation omitted)).

The Seventh Circuit has stated that "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978); *see also Ezell v. City of Chicago*, 651 F.3d 684, 697-700 (7th Cir. 2011) (finding irreparable harm when plaintiffs' Second Amendment rights were likely violated).  "When constitutional rights are threatened or impaired, irreparable injury is presumed.  A restriction on the fundamental right to vote therefore constitutes irreparable injury."  *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citations omitted) (affirming preliminary injunction against law which imposed shorter in-person early voting period for nonmilitary Ohio voters than for military voters).

In virtually all circumstances implicating the exercise of voting rights, courts have found post-deprivation remedies are insufficient to redress the impairment of constitutional and statutory rights that implicate a voter's ability to participate in an election.  This holds true whether the particular case involves an impairment or deprivation of the right to vote itself or, as here, the statutory entitlement in voter registration; as the latter is the gateway to the former, both are constitutionally protected.  *Williams v. Salerno,* 792 F.2d 323, 326 (2d Cir. 1986) (irreparable harm would have occurred if election board denied university students right to register to vote because dorms were not fixed homes); *U.S. Student Assn. Foundation v. Land,* 585 F. Supp. 925, 943–44 (E.D. Mich. 2008) (election board rejections of voter registration applications if confirming mail from board was returned as undeliverable constituted irreparable harm); *Common Cause Ind.*, 327 F. Supp. 3d 1139, 1155 (S.D. Ind. 2018), *aff'd*, 937 F.3d 944 (7th Cir. 2019) ("A violation of the right to vote is presumptively an irreparable harm.") (citing *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 1440–41 (2014); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Elrod v. Burns*, 427 U.S. 347, 373-74 & n.29 (1976) (plurality opinion); *Ezell*, 651 F.3d at 699)) (additional citations omitted); *Dillard v. Crenshaw,* 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."). Unconstitutional deprivation of one's voter registration constitutes irreparable harm, regardless of whether disenfranchisement ultimately results.  Moreover, "conduct that limits an organization's ability to conduct voter registration activities constitutes an irreparable injury."  *Indiana St. Conference of Nat'l Ass'n for Advancement of Colored People v. Lawson*, 326 F. Supp. 3d 646, 663 (S.D. Ind. 2018), *aff'd sub nom. Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019) (citations omitted) (hereinafter "*Indiana NAACP v. Lawson*") (preliminarily enjoining unlawful voter purge) (citations omitted).  "Where organizational plaintiffs are compelled to divert and

expend their resources to address a defendant's allegedly wrongful conduct, this is enough to satisfy their burden of showing a likelihood of suffering irreparable harm." *Id* (internal quotation omitted).

Preliminary injunctions are intended to preserve the status quo until such time as the Court can decide whether plaintiffs have proven their claims and established that a permanent injunction must be entered.  *See Dos Santos v. Columbus–Cuneo–Cabrini Medical Center*, 684 F.2d 1346, 1350–51 (7th Cir. 1982) (noting that "[t]he purpose of a preliminary injunction is to preserve the status quo pending a final hearing on the merits").  The status quo, in this case, requires a preliminary injunction to ensure that voters stay in the same position they are currently in— registered and able to vote without taking any additional action.  Here, the denial of Plaintiffs' motion for a preliminary injunction would change the entire nature of this action, as there would be no way to return to the time prior to deprivation and cure the due process violation.  That is to say, if the purge is carried out pursuant to a state court order that is not stayed and the requirements of which are not preliminarily enjoined by this Court, then the balance of this action seeking the permanent relief of new, adequate, and binding *pre-deprivation* notice letters will necessarily change.

In prior procedural due process cases, courts in the Seventh Circuit have recognized there is no way to return to that pre-deprivation moment.  In *Jessen v. Village of Lyndon Station*, this Court wrote that:

> [W]ithout preliminary relief, plaintiff will be terminated immediately from permanent employment without the procedural protections mandated by the due process clause of the Fourteenth Amendment to the Constitution of the United States. Under these circumstances, *it appears that plaintiff will lose his right to due process of law*, and that such a loss cannot be adequately compensated. *That is, even if plaintiff can prevail ultimately in this case, he still will have lost his constitutional right to a pretermination hearing, and there is no adequate means of restoring that right once the loss is suffered.*

519 F. Supp. 1183, 1189 (W.D. Wis. 1981) (emphasis added); *see also Morano v. Common Council of City of Racine*, 403 F. Supp. 335, 336 (E.D. Wis. 1975) (in due process case, finding irreparable harm where liquor license holder was not afforded hearing before denial of renewal and ordering preservation of plaintiff's license during pendency of litigation); *Bolton v. Bryant*, 71 F. Supp. 3d 802, 818 (N.D. Ill. 2014) (holding that denial of license to carry a concealed weapon without due process of law would infringe on the plaintiff's Second Amendment right, he would suffer irreparable harm and would have no adequate remedy at law).  As these cases demonstrate, here there is no way to adequately remedy a due process violation *post*-deprivation, and there is no remedy at law such as damages.[2]

When the process itself is at issue, reversing the deprivation the process was designed to prevent cannot cure the violation.  The statutory entitlement or liberty or property interest may be restored by court order, but the government's constitutional obligation to provide adequate notice and an adequate opportunity to be heard *prior to the deprivation* cannot be restored.  *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) ("[I]rreparable harm . . . is[ ] harm that cannot be prevented or fully rectified by the final judgment after trial.").  This reasoning *strongly* militates in favor of granting Plaintiffs preliminary relief to preserve the status quo by keeping the 234,039 registered Wisconsin voters flagged by ERIC *on* the voter rolls, until such time as Plaintiffs' claims can be fully and finally adjudicated.

Accordingly, the irreparability of the harm here does not turn on whether or not individual voters will have a difficult time re-registering including by late in-person registration at municipal clerks' offices or by Election Day registration at the polls, or on whether they would have a difficult

---

[2] In procedural due process claims, "there is no harm where the injury is ultimately redressable through monetary compensation." *Hamlyn v. Rock Island Cty. Metro. Mass Transit Dist.*, 960 F. Supp. 160, 163 (C.D. Ill. 1997) (involving an exclusion from a mass transit reduced fare program).

time satisfying the documentary proof of residence requirement.  A due process violation cannot be remedied by simply affording the injured party a procedure or opportunity after the fact to regain what was taken away—*especially* where that procedure or opportunity demands the injured party's self-initiative, as opposed to the government's reversal of the deprivation of a statutory entitlement or liberty interest.  And crucially, the harm is not limited to the deprivation of voter registration status; a multiplicity of harms inexorably flows from that seemingly unitary deprivation, such that even later reactivation cannot fully cure the due process violation here.  The Seventh Circuit has said that, "[t]he loss of a First Amendment right is frequently presumed to cause irreparable harm based on 'the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.'"  *Ezell*, 651 F.3d at 699 (quoting *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 548 (6th Cir. 2010) (internal alteration and quotation marks omitted)); *Elrod*, 427 U.S. at 373 ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").  Similarly, there is a flow of negative consequences from a deprivation of registration, a prerequisite to the exercise of a First Amendment-protected right.  If this purge goes forward, registered voters will see their registration has been cancelled without notice and may become disillusioned or disaffected with the process, perhaps even deterred from voting.  Additionally, if registered Wisconsin voters discover that they have been stripped of their voter registration without notice and/or following their detrimental reliance on the Commission's representations (now, effectively misrepresentations from the voters' perspective) as to registration address confirmation procedures, many will feel compelled to attempt to re-register in compliance *prior to* any reinstatement that might be secured by a ruling in Plaintiffs' favor in this action.  Voters who are

removed are also included on lists of voters purchased by outside groups and others doing voter outreach, and anyone deactivated would not receive any of this outreach until such time as they were restored to the Wisconsin voter rolls.  Poland Decl., Ex. Q, *WisVote Voter Data Requests*, WIS. ELECTIONS COMM'N, https://elections.wi.gov/clerks/svrs/voter-data (allowing purchase of Wisconsin voter lists).  Deactivated voters, even if reinstated, would also have experienced a time when they could not vote absentee.

Furthermore, if the purge occurs, Plaintiff League will also have to redouble its voter registration efforts due to the lack of due process afforded Wisconsin voters on the 2019 ERIC list. In 2018, a general election year, it spent over $12,000 and 6,500 volunteer hours conducting outreach and helping approximately 12,582 voters register to vote or update their registration. Grunze Decl., ¶¶ 5–6.  Defendants have offered no evidence that they have taken steps to ensure that the 2019 ERIC list does not have the same error rate as the 2017 ERIC list (7.78 percent), meaning that the Plaintiff League will have to work to re-register as many of these 18,000-plus voters as possible in the eight weeks before the February 18, 2020 elections.  The time, money, and other resources devoted to conducting these registration drives would never be recovered, and therefore constitute irreparable harms.

### 3.  The Balance of Harms

The third element involving the balance of harms comes down to a requirement that injunctive relief "must do more good than harm."  *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d 721, 725 (7th Cir. 2009).  The balancing requires the court "to choose the course of action that minimizes the cost of being mistaken" and "compare the potential irreparable harms faced by both parties to the suit – the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the

nonmoving party if the preliminary injunction is granted." *Girl Scouts of Manitou Council*, 549 F.3d at 1100. The balancing of harms also impacts the threshold requirement of the plaintiff's likelihood of success: "[h]ow strong a claim on the merits [must be] depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy*, 582 F.3d at 725. This "sliding scale" approach means that the "more likely it is that [the plaintiff] will win its case on the merits, the less the balance of harms need weigh in its favor." *Girl Scouts*, 549 F.3d at 1100.

Failing to give voters adequate notice of their removal from the rolls and changing the rules of voter registration so soon before elections, such that voters will rely to their detriment on the Commission's former statements, are per se violations of the Due Process clause. The multiple, additional harms that flow from even temporary loss of voter registration status compound the central harm of cutting off the continuous registration of a Wisconsin voter. This coming year, there will be a number of elections in quick succession: a spring primary election, a U.S. Congressional District special election, a Wisconsin Supreme Court election, a partisan primary election, and a presidential and general election. On the other side of the balancing scales, Defendants' Counsel at the Wisconsin Department of Justice have already represented that the state does not have a strong countervailing interest in immediately purging these 234,039 registered Wisconsin voters. At the December 13, 2019 hearing in *Zignego*, Defendants' Counsel sought to rebut the *Zignego* plaintiffs' unsubstantiated assertions that voter fraud would occur absent the immediate deactivation of these voters:

> It also then assumes that these people who are improperly registered are going to vote, so we don't know that that's gonna happen, and then it assumes that they're going to vote improperly at their – at a – at an address for which they're not properly registered and commit voter fraud. There's no evidence of that nature of voter fraud in this case.

Poland Decl., Ex. G, Hr'g Tr. at 57:24–58:5.

If anything, Defendants will benefit from the entry of a preliminary injunction in this case, because it will prevent the administrative chaos that will flow from imposing significant rule changes that will require new and fast communication with hundreds of thousands of voters and the cancellation of so many voters so soon before the deadlines to mail out absentee ballots in two different elections.  Defendants' Counsel have already argued to the state court that the mandamus order would work an unprecedented, eleventh-hour change in election rules and procedures and cause irreparable harm to the integrity and efficiency of these elections: "If the Commission's duty is for a efficiency of election administration, . . . this would create chaos, to do this now."  Poland Decl., Ex. G, Hr'g Tr. at 77:13–15.  In this case, absentee ballots for the February 18, 2020 spring primary election will be sent out on January 28, 2020, and absentee ballots for the Seventh U.S. Congressional District special primary election, also to be held on February 18, 2020, will be sent out thirteen days from now on January 2, 2020.  In this case, voters' interests and the state's interests in the efficient and fair administration of elections, as well as the public's interest in election integrity, are all aligned and opposed to changing voting rules and the rules and procedures for voter registration and voter list maintenance, stripping voters of their continuous registration status mere weeks before absentee ballots must be mailed out for impending elections.

The U.S. Supreme Court has ruled on multiple occasions, including in the Wisconsin voter ID litigation, that in considering whether to grant an injunction that changes election laws soon before an election, the courts must consider whether such relief will create administrative chaos, compromise the integrity of the election, and/or burden the right to vote.  *See Purcell v. Gonzalez*, 549 U.S. 1 (2006).  The Court has specifically acted to block changes to Wisconsin election laws close to an election.  In 2014, Wisconsin's photo ID law was blocked by Judge Lynn Adelman of the U.S. District Court for the Eastern District of Wisconsin and then less than two months before

the midterm elections, the U.S. Court of Appeals for the Seventh Circuit reversed and stayed the district court's permanent injunction. *Frank v. Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014), *rev'd by* 768 F.3d 744 (7th Cir. 2014). The plaintiffs immediately sought emergency relief at the U.S. Supreme Court. While the Supreme Court's order was sparse, the 6-3 majority's grant of the application to vacate the stay and thus leave the photo ID law enjoined for the election appears to have been based on the risk of disenfranchisement due to voters' detrimental reliance on official instructions. *Frank v. Walker*, 135 S. Ct. 1551 (2015) (mem.). Even the dissenting Justices, Justices Alito, Scalia and Thomas, felt compelled to acknowledge that "[t]here is a colorable basis for the Court's decision due to the proximity of the upcoming general election" and noted that it was "particularly troubling that absentee ballots ha[d] been sent out without any notation that proof of photo identification must be submitted." *Id.*

Finally, the reason this purge has been ordered on the eve of multiple elections is because the *Zignego* plaintiffs delayed five months before filing their state mandamus action seeking the immediate purge. The *Zignego* plaintiffs sat on their claims and delayed the ultimate issuance of the mandamus order by filing their complaint five months after the Commission first adopted the 12-to-24-month deactivation timeline at its June 11, 2019 meeting. Poland Decl., Ex. B, June 11, 2019 WEC Memorandum, at 3–5; Ex. D, Wisconsin Elections Commission, *Excerpt from September 24, 2019 Agenda Documents*, June 11, 2019 Meeting Minutes, at 3 (noting unanimous adoption of motion to "[a]uthorize staff to flag files of voters rather than deactivating voters who do not respond to a Movers mailing after 30 days"). The *Zignego* plaintiffs' claims were ripe in June, and they need not have delayed until after the 2019 notices were mailed out. However, they

did not file *Zignego* until after Defendant Commissioner Robert Spindell met with them and encouraged them to bring the suit.[3]  This occurred before he was appointed to the Commission.[4]

### 4.  The Public Interest

The balancing of harms also looks at the effect on nonparties and the public interest.  The Seventh Circuit has stated that remedying a "continuing constitutional violation . . . certainly would serve the public interest."  *Preston*, 589 F.2d at 303 n.3; *see also Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("Surely, upholding constitutional rights serves the public interest.") (quoting *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).  Issuing a preliminary injunction to prevent the purging of seven percent of the Wisconsin electorate, until such time as this litigation can be resolved, would serve the public interest by vindicating constitutional rights and ensuring that the integrity and efficiency of election administration in Wisconsin is not marred by the unconstitutional failure to give eligible voters notice and an opportunity to stay on the voter rolls.  The public has a strong interest in the safeguarding of due process rights afforded *prior to* the deprivation of liberty, property, or statutory entitlements.

### C.  Expedited Discovery is Necessary to Resolving Plaintiffs' Case.

Given the exigent circumstances alleged in Plaintiffs' Complaint and presented by Plaintiffs' Motion for Preliminary Injunction, Plaintiffs respectfully move this Court for leave to

---

[3] Poland Decl., Ex. R, Wisconsin Elections Commission Meeting Video, 3:35:34—3:36:23 (Dec. 2, 2019), *available at* https://wiseye.org/2019/12/02/wisconsin-elections-commission-december-2019-meeting/.

[4] *Id.*

conduct limited expedited discovery necessary to present and resolve their preliminary injunction motion, and then to conduct further expedited discovery that is narrowly tailored to resolve the remaining issues, which most likely will involve a permanent injunction hearing.  Preliminary relief halting the voter purge need not stay in place any longer than necessary, if a permanent injunction is entered, instructing the Commission to issue new, adequate notices should the Commission want to move forward with any removals based on the 2019 ERIC list.  To those ends, expedited discovery is necessary.  More specifically, Plaintiffs seek to take limited, discovery relating to ERIC's and the Commission's procedures for deciding which of each voter's addresses is the later-in-time address, and what rules ERIC and/or the Commission apply to determine which of the voters' conflicting addresses to use in mailing the ERIC letter.  This is relevant to the question of whether the voter has moved from the address to which the ERIC letter is mailed, an issue that pertains to Count Two.  Plaintiffs also seek to take expedited discovery relating to the lag time between when ERIC receives static data from the State of Wisconsin, and when the Commission causes ERIC letters to be mailed to voters.  Plaintiffs also will seek to take a short deposition of Defendant Wolfe, the Commission's Administrator and will make themselves and other witnesses who have submitted a declaration in support of Plaintiffs' preliminary injunction motion available for deposition immediately, so that a preliminary injunction hearing can be held at the earliest possible date.

Under Federal Rule of Civil Procedure 26(d) and the Court's Standing Order Governing Preliminary Pretrial Conferences, parties generally may not seek to take discovery until they have conferred regarding all matters listed in Federal Rule of Civil Procedure 26(f).  Fed. R. Civ. P. 26(d)(1) ("A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule

26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order.").  The Court has not yet set a date for the preliminary pretrial conference held pursuant to Federal Rule Civil Procedure 16, and so the dates by which the parties must submit their proposed discovery plan and confer regarding the discovery plan have not yet been set, nor has the Rule 26(f) conference occurred.  Consequently, Plaintiffs must obtain the Court's leave to take the discovery they seek to fully present their preliminary injunction motion to the Court.  *See, e.g., Zimmer, Inc. v. Stryker Corp.*, No. 14-cv-152 JD, 2014 WL 12805045, at *1 (N.D. Ind. Feb. 11, 2014); *Centrifugal Acquisition Corp., Inc. v. Moon*, No. 09-C-327, 2009 WL 1249294, at *1 (E.D. Wis. May 6, 2009).

When a party seeks to take expedited discovery before permitted by the rules, district courts apply a good cause or reasonableness test.  *See Restoration Hardware, Inc. v. Haynes Furniture Co.*, No. 16 CV 10665, 2017 WL 3597518, at *2 (N.D. Ill. March 13, 2017) ("In the context of preliminary injunction proceedings, courts in the Seventh Circuit will consider a request for expedited discovery 'on the entirety of the record to date and the reasonableness of the request in light of the all the surrounding circumstances.'" (citation omitted); *see also Sheridan v. Oak Street Mortgage, LLC*, 244 F.R.D. 520, 522, (E.D. Wis. 2007); *Centrifugal Acquisition Corp.*, 2009 WL 1249294, at *1.  Under the "good cause" or "reasonableness" test, the Court may consider the following factors in ruling on Plaintiffs' motion: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery sought; (3) the purpose for requesting expedited discovery; (4) the burden on the opposing party; and (5) how far in advance of the typical discovery process the request is made. *Restoration Hardware*, 2017 WL 3597518, at *2.  Here, Plaintiffs' motion easily satisfies these factors.

*First*, Plaintiffs are moving for a preliminary injunction contemporaneously with seeking expedited discovery, so there is a preliminary injunction motion pending. This factor is significant;

as the Advisory Committee noted in its 1993 amendments, "Discovery can begin earlier if authorized . . . by local rule, order, or stipulation. This will be appropriate in some cases, *such as those involving requests for a preliminary injunction* or motions challenging personal jurisdiction." Fed. R. Civ. P. 26(d) advisory committee's note to 1993 amendment (emphasis added); *see also Sheridan*, 244 F.R.D. at 521 ("Requests for preliminary injunction . . . are examples of situations which may warrant expedited discovery.").

**Second**, Plaintiffs are initially seeking to expedite limited discovery that is narrowly tailored to adduce evidence pertinent to their preliminary injunction motion, and then to take such further discovery only as is necessary for the Court to hear and resolve a permanent injunction motion. As described above, that includes discovery relating to ERIC's and the Commission's procedures for deciding which of each voter's addresses is the later-in-time address; what rules ERIC and/or the Commission apply to determine to which of the voters' conflicting addresses to use in mailing the ERIC letters; the lag time between when ERIC receives static data from the State of Wisconsin and when the Commission mails out the ERIC letters to voters on the list; and potentially defenses raised by the Defendants that they would seek to present at the preliminary and permanent injunction hearings. Plaintiffs also will seek to take a short deposition of Defendant Wolfe, the Commission's Administrator, and will make their witnesses available for deposition.

**Third**, Plaintiffs request expedited discovery so that they may present and the Court may hear and resolve their motion for preliminary injunction to prevent 234,000 registered Wisconsin voters from having their registrations deactivated based solely on the Commission's mailing of an unconstitutionally deficient letter to them notifying them (sometimes erroneously) that they have moved from the address at which they are registered to vote, but failing to notify them that their registrations will be deactivated if they fail to respond within 30 days.

**Fourth**, there is little, if any, burden on the Defendants to comply with the discovery sought.  The information sought should be readily available to the Commissioners, through the Commission and Defendant Wolfe. Indeed, given the sheer amount of attention that the Commission has given to the issues raised by this preliminary injunction motion, Plaintiffs expect that Defendants can very quickly identify the information and materials that Defendants seek to discover, and that it can be promptly provided without substantial time or effort by the Defendant Commissioners personally.  Moreover, Plaintiffs' counsel's offices are located immediately adjacent to Defendants' counsel's offices, and just down the street from the Commission's offices, so depositions can be easily arranged at mutually convenient times and locations with little to no need for travel.  Plaintiffs will work to agree with Defendants' counsel on an appropriate time limitation for each deposition.

**Fifth**, because the Court has not yet fixed a date for the preliminary pretrial conference, Plaintiffs' counsel cannot identify how far in advance of regularly scheduled discovery their request comes. Based on past experience, counsel estimates that Plaintiffs seek to take their narrowly tailored expedited discovery approximately 60 days before discovery otherwise would commence.

In sum, Plaintiffs easily satisfy the criteria they must meet under the "good cause" or "reasonableness" standard to take expedited discovery to fully present their motions for injunctive relief to the Court, as other district courts within this Circuit have held.  *See, e.g., Sheridan*, 244 F.R.D. at 522 (granting in part plaintiffs' motion for expedited discovery); *Restoration Hardware*, 2017 WL 3597518, at *3 (granting in part defendants' motion for expedited discovery where preliminary injunction motion pending); *Zimmer*, 2014 WL 12805045, at *1 (granting in part plaintiff's motion for expedited discovery where preliminary injunction motion pending, noting

that plaintiff "promptly moved for a preliminary injunction, and permitting the parties to conduct expedited discovery in advance of the evidentiary hearing on that motion will permit the parties to more fully develop their arguments and will assist the Court in fairly adjudicating the issues before it").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter a preliminary injunction enjoining Defendants from deactivating, canceling, or otherwise changing the registration status of any registered Wisconsin voter on the basis of their presence on the 2019 ERIC list until such time as the permanent injunction requested below is entered, unless that voter contacts the Wisconsin Elections Commission or any municipal clerk's office to confirm their registration address or to inform the Commission or any municipal clerk's office that they have moved to another state.  Plaintiffs also respectfully request that this Court grant their motion to expedite discovery to speed the resolution of this case.

**DATED:** December 20, 2019

Respectfully submitted,

*/s/ Jon Sherman*

Jon Sherman*
D.C. Bar No. 998271
Cecilia Aguilera*
D.C. Bar No. 1617884
Michelle Kanter Cohen*
D.C. Bar No. 989164
Fair Elections Center
1825 K St. NW, Ste. 450
Washington, D.C. 20006
jsherman@fairelectionscenter.org
caguilera@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
(202) 331-0114

Douglas M. Poland
State Bar No. 1055189
David P. Hollander
State Bar No. 1107233
Rathje Woodward LLC
10 E Doty Street, Suite 507
Madison, WI 53703
Phone:  608-960-7430
Fax:  608-960-7460
dpoland@rathjewoodward.com
dhollander@rathjewoodward.com

*Counsel for Plaintiffs*

*Motions for admission to be filed*